155 P.3d 171 (2007)
In re the MARRIAGE OF Gloria BERNARD, Respondent, and
J. Thomas Bernard, Appellant.
No. 57296-2-I.
Court of Appeals of Washington, Division 1.
April 9, 2007.
*172 Camden Michael Hall, Camden Hall, PLLC, Seattle, WA, for Appellant.
Cynthia B. Whitaker, Melissa Mager, Law Offices of Cynthia B. Whitaker, Jerry Richard Kimball, Catherine Wright Smith, Edwards Sieh Smith & Goodfriend PS, Seattle, WA, for Respondent.
BAKER, J.
¶ 1 This is an appeal from the first half of a bifurcated dissolution trial. Husband Tom Bernard appeals the trial court's verdict that the prenuptial agreement and subsequent amendment are unenforceable.

I.
¶ 2 Tom Bernard hired Gloria Whitehead in 1994. Gloria worked for Tom's real estate development and management firm. In April 1999, they were engaged to be married. Both had been married before, and both had adult children. The parties had an imbalance of assets: Tom's net worth at the time was approximately $25 million, Gloria's was $38,000.
¶ 3 When he proposed, Tom mentioned a prenuptial agreement. Gloria consented to sign an agreement, but Tom did not contact his attorney of 25 years right away because, "we weren't about to get married, you didn't need to negotiate a prenup' unless the wedding is coming up."[1] No action was taken to *173 draft an agreement until May 24, 2000, less than six weeks before the July 8 wedding date. His attorney, Richard Keefe, faxed Tom a checklist of items to be included in a prenuptial agreement. Tom lost the list and Keefe had to resend it on June 8. Tom asked Gloria to prepare his lengthy financial statement, so he could attach it to the agreement. She did so, and also completed her own financial statement. During this same period, Tom was urging Gloria to retain her own attorney. Gloria made efforts to do so, but could not find an attorney she was comfortable hiring. She also believed that she needed to have a draft agreement first.
¶ 4 On June 20, 18 days before the wedding, Gloria received the first draft of the agreement, containing a number of blanks. With draft agreement in hand, Gloria stepped up her search for an attorney. During the same period, however, she was also preparing Tom's financial statement, moving out of her home and into Tom's, preparing for her daughter's graduation and trip to Mexico, finalizing the wedding plans, and working at Bernard Development Company. After many inquiries, Gloria was referred to attorney Marshall Gehring by a co-worker.
¶ 5 Gehring first received a draft copy of the agreement from Keefe on July 5, three days before the wedding. Keefe's cover letter to Gehring cautioned that Tom had not yet seen that version of the agreement. Gehring reviewed the document, and on the day before the wedding he wrote a letter to Gloria and advised her not to sign it. He cited five major concerns with the agreement; these were not the only problems he noted, but time was short. He also acknowledged that refusing to sign was probably not practical. Gehring did not tell Gloria that they could have waited until later to negotiate a more equitable agreement. Keefe and Tom quickly drafted a "side letter" in which both parties agreed to amend the prenuptial agreement with respect to the five issues raised in Gehring's advice letter.
¶ 6 Gloria signed both the prenuptial agreement and the side letter within 24 hours of the wedding. The side letter incorporated Gehring's suggestions, but Gloria signed it without first consulting Gehring. She said she signed the agreement because she felt she had no alternative. To refuse would mean canceling the wedding, she said, because the agreement was a test of her love and loyalty. She did not feel that the agreement was fair. Tom conceded that the first agreement needed to be amended.
¶ 7 In August 2001 an amendment was executed, based on the terms contained in the side letter. Although both parties were involved in the drafting process, Gloria believed that no terms of the agreement were open for discussion other than those mentioned in Gehring's letter. The amendment was a separate document, not a redraft of the original agreement. The side letter stated that if the parties failed to reach agreement on the amendment, the original agreement remained in full force and effect. Gloria signed the amendment because Gehring told her that having signed the prenuptial she was stuck with it, but at least the amendment was a "little bit better."[2] The prenuptial agreement as amended still severely restricted Gloria's community property rights.
¶ 8 Gloria filed for divorce in early 2005. Tom demanded arbitration based on the original agreement's arbitration clause. Gloria moved for summary judgment to have the entire prenuptial agreement, including the arbitration clause, declared unenforceable. The trial court declared the agreement substantively unfair as a matter of law and denied Tom's motion to compel arbitration. The first part of a bifurcated trial examined the procedural fairness of the agreement as amended. The judge decided that the adoption of the amendment was procedurally fair. However, because the side letter did not allow for renegotiation of the entire agreement, the amendment did not cure the procedural defects in the original agreement, so the agreements taken together were procedurally unfair. Nothing more was said specifically about Tom's request for arbitration. But it appears that all concerned assumed that if the agreement as a whole was unenforceable, then the arbitration clause was also ineffective. Tom appealed the verdict.

*174 II.
¶ 9 The trial court's refusal to order arbitration is essentially denial of a motion to compel arbitration, which is reviewed de novo.[3] Evaluation of the substantive and procedural fairness of a prenuptial agreement involves mixed questions of legal policy and fact. It is treated as a question of law, to be viewed in light of the undisputed findings and the findings supported by substantial evidence.[4]

III.
¶ 10 Instead of trying the validity of the agreement as a whole, the trial court should have first determined whether the arbitration clause, viewed independently, was substantively or procedurally unconscionable. This rule comes from Pinkis v. Network Cinema Corp.[5]Pinkis held that an arbitration clause contained within a larger agreement must be evaluated independently before the court deals with substantive issues concerning the contract.[6] Judicial review of the matter is limited to whether the arbitration clause, viewed separately, is subject to traditional contract defenses such as fraud or unconscionability.[7] The court may deny arbitration and proceed with other issues only if it concludes that the arbitration clause was improperly transacted.[8]
¶ 11 However, this case requires more than a rote application of the Pinkis rule. No court has yet determined the effect of Pinkis in the context of a prenuptial agreement. We apply a different standard of enforceability to prenuptial agreements, the Foran[9] test. If the issue were properly before us, we would need to determine whether the Foran test, as opposed to traditional contract defenses, applies to an arbitration clause when that clause is seated within a prenuptial agreement.
¶ 12 But because the parties do not raise this issue, it is inappropriate for us to decide it.[10] Although RAP 2.5(a) allows us to affirm on any sufficiently developed ground, the Pinkis issue was not even discussed, much less developed, in the trial court or on appeal. Even though the trial court erred, the issue is now the law of the case, and the trial court can refuse to consider it on remand.[11]
¶ 13 We therefore turn to the briefed issue, whether the entire agreement as amended was substantively and procedurally fair. The agreements must be evaluated under a two-pronged test, cited in Foran.[12] First, we must decide whether they make fair and reasonable provision for the party not seeking enforcement. If we answer this question "yes," then the analysis ends and the agreements are validated. If not, the second prong of the analysis involves two tests: (1) whether full disclosure has been made of the amount, character, and value of the property involved, and (2) whether the agreements were entered into fully and voluntarily on independent advice and with full knowledge by both spouses of their rights.[13]
¶ 14 Tom does not seriously dispute that the July 7, 2000 prenuptial agreement, standing alone, was both substantively and procedurally *175 defective.[14] Instead, he argues that the amendment cured any procedural and substantive defects in the prenuptial.
Substantive Fairness
¶ 15 The trial court correctly determined that the agreement as amended is not substantively fair and reasonable. It fails the first prong of the Foran test.[15] Even considering the amendment, the agreement still severely restricts the creation of community property, especially if death or dissolution occurs within ten years of marriage. Community property rights are completely eliminated in the short term, yet Tom can enrich his own separate property at the expense of the community. For example, Gloria's labor benefits Tom's separate property, but she cannot share in the increase in value to his business. Despite disallowing community property, the amended agreement also makes no provision for Gloria from Tom's separate property regardless of how long the marriage lasts. There is no allowance for reimbursement of Gloria's contributions or personal services to Tom's separate property. There is no allowance for maintenance, again regardless of the length of the marriage. Even if the parties had stayed married for twenty years, Gloria could not be awarded their home after Tom's death. This kind of imbalance is what doomed a similar agreement in Foran.[16]
Procedural Fairness
¶ 16 The trial court erred when it concluded that adoption of the amendment was procedurally fair. Both the original agreement and the amendment failed the second prong of Foran. Neither document was drafted with the benefit of independent counsel, the bargaining positions of the parties were grossly imbalanced, and at no time did Gloria have full knowledge of her legal rights.[17]
Independent Counsel
¶ 17 Although Gehring was "independent" in the sense that he was not hired by Tom, he did not fulfill the primary duty of independent counsel, "assisting the subservient party to negotiate an economically fair contract."[18] Upon receiving the draft agreement, Gehring's role was limited to commenting on unfair provisions and advising Gloria whether or not to sign the document as written. Although they did have the benefit of time during the amendment discussions, Gehring and Gloria did not believe that the entire prenuptial agreement was on the table. Gehring told Gloria that she had no option to reopen negotiations about the rest of the agreement.[19] He said that after she signed the original agreement, however flawed, it was not open for negotiation during discussions about the amendment.
Full Knowledge of Rights
¶ 18 Gloria also never had full knowledge of her rights, because Gehring did not advise her accurately. He did not explain community property, or how the agreement altered Gloria's rights under the law. Gehring's assessment that the prenuptial agreement was substantively fair in the short term was flawed. Gehring said that any appeal from binding arbitration would be a trial de novo, apparently in the erroneous belief that the mandatory arbitration rules would apply to a private agreement to arbitrate. He also told Gloria that even if she agreed to arbitrate, *176 she could avoid binding arbitration by applying to a court for relief.
¶ 19 Gehring told Gloria that after enough time had passed, the agreement would become irrelevant and could be ignored by a court. He testified that despite concerns with minor difficulties, Gloria was happy with the amendment. Gloria's trial counsel suggested that it is "hard to be knowingly happy with something that you don't understand."[20] Gehring replied, "Sometimes ignorance is bliss."[21] Because Gloria never had full knowledge of her rights, both the agreement and the amendment were procedurally unfair.
Relative Bargaining Positions
¶ 20 The parties' bargaining positions were grossly imbalanced. Gloria believed that she had no bargaining power regarding the amendment. If Gloria refused to sign the amendment, she stood to lose her husband, her job of seven years, and her home. She had not arranged for financial aid for her children's education because Tom had promised to assist them. Gloria had deposited half her annual salary into a community property account, half of which Tom would retain if she left. Finally, the side letter made clear that if Gloria did not sign the amendment, then the original agreement would remain in force. Compared to Tom, Gloria's bargaining position was weak.
¶ 21 In addition, the amendment was nothing more than a codification of the provisions of the side letter, which Gloria signed the day of the wedding. It was not a renegotiation of the entire agreement. Gehring and Gloria both testified that the amendment could only address those items listed in the side letter. In fact, the final amendment adopted the side letter almost entirely. Any procedural analysis of the amendment must take the circumstances of the side letter into account. Procedurally, the side letter was adopted in the same manner as the original agreement: finalized and signed within 24 hours of the wedding.
¶ 22 The trial court erred in concluding that the amendment passed the second prong of the Foran test. The judge relied too much on the fact that Gloria was represented, however inadequately, by counsel, and the fact that the amendment was not rushed. The other important criteria discussed above  the duty of independent counsel, bargaining positions of the parties, and full knowledge of legal rights  are missing from the analysis.
¶ 23 The agreement and amendment were procedurally unfair under Foran. Also, the amendment was based almost completely on the side letter, which was as rushed and procedurally flawed as the prenuptial agreement itself. The trial court erred when it concluded that the amendment was procedurally sound.[22]
¶ 24 Tom contends that the trial court erred in refusing to uphold the amendment based on its conclusion that the amendment was procedurally fair. But a trial court's decision may be sustained on any theory within the pleadings and the evidence.[23] Because the amendment was procedurally flawed, the decision not to enforce the agreement as amended was proper.
Attorney Fees
¶ 25 The trial court, under Stringfellow v. Stringfellow,[24] awarded fees in advance to Gloria, to cover the cost of responding to this appeal. Tom assigned error to this decision, and has not paid the fees to Gloria. But he has not briefed the issue, nor cited any authority to this court, so his challenge *177 to the fees will not be reviewed.[25] The trial court's order regarding fees is affirmed.
¶ 26 AFFIRMED.
WE CONCUR: ELLINGTON and AGID, JJ.
NOTES
[1] Report of Proceedings (RP) (Sept. 8, 2005) at 29.
[2] RP (Sept. 7, 2005) at 60.
[3] Kruger Clinic v. Regence Blueshield, 157 Wash.2d 290, 298, 138 P.3d 936 (2006). Denial of Tom's motion to stay pending arbitration was essentially denial of a motion to compel. The trial court somewhat erroneously characterized Tom's motion as a motion for summary judgment. Either way, the standard of review is de novo.
[4] In re Marriage of Foran, 67 Wash.App. 242, 251, 834 P.2d 1081 (1992).
[5] 9 Wash.App. 337, 345, 512 P.2d 751 (1973).
[6] Pinkis, 9 Wash.App. at 345, 512 P.2d 751. Although the arbitration agreement in Pinkis fell under the federal arbitration laws, the same rule applies when Washington's arbitration laws are at issue. See, Keen v. IFG Leasing Co., 28 Wash. App. 167, 622 P.2d 861 (1980).
[7] Pinkis, 9 Wash.App. at 345, 512 P.2d 751.
[8] Pinkis, 9 Wash.App. at 345-46, 512 P.2d 751.
[9] In re Marriage of Foran, 67 Wash.App. 242, 834 P.2d 1081 (1992).
[10] RAP 2.5(a).
[11] RAP 2.5(c)(1); State v. Barberio, 121 Wash.2d 48, 49-51, 846 P.2d 519 (1993).
[12] Foran, 67 Wash.App. at 249, 834 P.2d 1081.
[13] Foran, 67 Wash.App. at 249, 834 P.2d 1081.
[14] Tom accuses Gloria of dragging her feet in obtaining an attorney. But Tom, who requested the prenuptial in the first place, also dragged his feet by waiting until May to draft an agreement. He makes no argument and cites no support for the proposition that Gloria's action or inaction excuses any other procedural unfairness.
[15] In fact, it closely mirrors the unfair agreement at issue in Foran. Foran, 67 Wash.App. at 250, 834 P.2d 1081.
[16] Foran, 67 Wash.App. at 250-51, 834 P.2d 1081.
[17] In re Marriage of Matson, 107 Wash.2d 479, 484, 730 P.2d 668 (1986).
[18] Foran, 67 Wash.App. at 254, 834 P.2d 1081.
[19] Tom claims that Gehring's file contains proposed edits to the agreement that belie his sworn testimony. But the test here is whether substantial evidence supports Gloria's position. Foran, 67 Wash.App. at 251, 834 P.2d 1081.
[20] Clerk's Papers at 687.
[21] Clerk's Papers at 688.
[22] A conclusion of law erroneously labeled as a finding of fact is nevertheless reviewed as a conclusion of law. City of Tacoma v. William Rogers Co., 148 Wash.2d 169, 192, 60 P.3d 79 (2002).
[23] Foran, 67 Wash.App. at 248, 834 P.2d 1081.
[24] 53 Wash.2d 359, 361, 333 P.2d 936 (1959) (trial court has authority to award "suit money on the appeal"), subsequent proceedings at 56 Wash.2d 957, 350 P.2d 1003 (1960).
[25] State v. Dennison, 115 Wash.2d 609, 629, 801 P.2d 193 (1990).