[No. 80348-0.   En Banc.]
Argued May 27, 2008.    Decided April 9, 2009.

*In the Matter of the Marriage of* GLORIA BERNARD, *Respondent*, and THOMAS BERNARD, *Petitioner*.

896

*Thomas Bernard,* pro se.

*Douglas P. Becker* (of *Wechsler Becker, LLP*) and *Kenneth W. Masters* (of *Wiggins & Masters, PLLC*), for petitioner.

*Cynthia B. Whitaker, Jerry R. Kimball*, and *Melissa Mager* (of *Law Offices of Cynthia B. Whitaker*) and *Catherine Wright Smith* and *Valerie A. Villacin* (of *Edwards Sieh Smith & Goodfriend, PS*), for respondent.

¶1 STEPHENS, J. — Gloria Bernard filed for dissolution from Thomas Bernard.[1] We are asked to determine the enforceability of their prenuptial agreement. We hold the agreement is not enforceable because it is substantively and procedurally unfair. We affirm Gloria's award of attorney fees and costs.

## FACTS AND PROCEDURAL HISTORY

¶2 In 1995 Thomas hired Gloria to be the operations manager for Bernard Development Company. In late 1998, after the death of Thomas's first spouse, Thomas and Gloria began dating. Thomas asked Gloria to marry him but informed her he would require a prenuptial agreement because of the disparity in their relative wealth. At the time of their engagement, Thomas was 55 and a successful real estate developer with a net worth of approximately $25 million; Gloria was 49, held undergraduate and master's degrees in business administration, and had a net worth of approximately $8,000. The events surrounding the signing of the prenuptial agreement and its amendment are the subject of this litigation.

¶3 In January 2000, Thomas and his longtime attorney, Richard Keefe, began working on the prenuptial agree-

---

[1] For ease of reference this opinion will refer to the parties by first name.

ment. Thomas and Keefe repeatedly advised Gloria to obtain independent counsel but did not provide her with a draft of the proposed agreement. Lacking a draft, Gloria took no action to obtain representation. On May 24, Keefe prepared a prenuptial checklist for Thomas and Gloria and encouraged Gloria to obtain counsel. He provided her with the names of three attorneys but did not provide her with a draft agreement. On June 8, Keefe again encouraged Gloria to obtain independent representation, resending the prenuptial checklist. Gloria still did not have a draft of the agreement, however, and did not consult counsel at that time. Not until June 20, 18 days before the wedding, did Gloria receive a draft of the prenuptial agreement.

¶4 On July 5, Gloria met with Marshall Gehring, an attorney experienced in prenuptial negotiations. That evening Gehring received a working draft of the prenuptial agreement from Keefe. It was substantially different from the draft Keefe gave to Gloria on June 20.

¶5 Gehring testified at trial that he did not have sufficient time to conduct a full review of the agreement or draft a counteragreement. Instead, in a letter to Gloria dated July 7, the day before the wedding, he identified five areas of major concern with the prenuptial agreement. He indicated in his letter that he had additional minor concerns but did not specify what those were. Gehring's letter recommended that Gloria negotiate some kind of additional written instrument to address the concerns he outlined. In testimony, Gehring agreed that he had time to only "hit the high points" in his letter and said he would have reviewed the agreement "page by page" if he had been given more time. He further testified that during the short time he had to review the agreement, it was very difficult to talk directly with Gloria, as she was busy with guests, wedding details, and honeymoon preparations.

¶6 In addition, Thomas testified that he would have called off the wedding on its eve, or even the day of, had Gloria not signed the prenuptial agreement. Gloria testified

that she believed Thomas would not have married her if she had refused to sign the agreement.

¶7 Gloria signed the prenuptial agreement the day before the wedding, on July 7, with the understanding that it would be amended. Thomas and Gloria's wedding took place at the Seattle Tennis Club on July 8 and included approximately 200 guests, some of whom had come from out of town.

¶8 Gloria and Thomas signed a "side letter" on the day of the wedding, agreeing to renegotiate the five areas of major concern Gehring noted in his July 7 letter. Both Gloria and Gehring testified that they believed the negotiations that followed the side letter were limited to the five areas identified by Gehring. Report of Proceedings (RP) (Sept. 6, 2005) at 112;[2] RP (Sept. 12, 2005) at 17.[3] The side letter required the anticipated amendment to be finalized no later than October 7, 2000, but the amendment would not be finalized until August 28, 2001. When it was eventually finalized, the amendment ratified the original prenuptial agreement and altered several provisions in accordance with each of Gehring's concerns.

¶9 Gloria filed for dissolution on February 4, 2005. Thomas demanded arbitration under the terms of the prenuptial agreement. Gloria moved for summary judgment, challenging the enforceability of the prenuptial agreement.[4] The trial court bifurcated its analysis of the enforceability of the prenuptial agreement.

---

[2] Gehring testified regarding the postnuptial agreement: "My job was [to] tell her don't sign the [prenuptial] agreement. She signed it. Now we're going to fix it. Well, okay. The agreement was that the—the agreement she made, we were going to limit it to certain items."

[3] Gloria testified regarding the postnuptial agreement: "[w]hat [Gehring] told me is . . . these are the only points that we're able to amend, and I'm trying to do the best I can to have this wording changed or whatever on these five points . . . ."

[4] The issue of whether the trial court should have analyzed the arbitration clause prior to determining the enforceability of the entire prenuptial agreement is not raised in this appeal. Thomas concedes the enforceability of the arbitration clause is dependent on the enforceability of the prenuptial agreement as a whole.

¶10 The court determined that the prenuptial agreement, as amended, was substantively unfair as a matter of law. The court directed a trial on the question of procedural fairness. After a four day trial, the court found the prenuptial agreement, as amended, was procedurally unfair. First, the court found that the draft sent to Gehring on July 5 was substantially different from the version Gloria received on June 20. The court further found that Gloria and Gehring received the revised draft of the agreement only a few days before the wedding, "too late to provide time for meaningful negotiation and full advise [sic]." Clerk's Papers (CP) at 1814. The trial court also found that "[b]ecause of the impending wedding [Gloria] was faced with the choice of the humiliation of calling off a wedding or signing a substantively unfair document." CP at 1816. Next, the court found the subsequent amendment did not cure the procedural defects of the original agreement because the terms of the side letter restricted the scope of renegotiation. *Id.* Accordingly, "[a]s the scope of the negotiations allowed by the 'side letter' were so specifically limited, the fact that there was sufficient time for independent review and for the advice of counsel was insufficient to cure the defects of the first agreement." *Id.* The trial court concluded that the agreement lacked procedural fairness.

¶11 Division One of the Court of Appeals affirmed. *In re Marriage of Bernard*, 137 Wn. App. 827, 155 P.3d 171 (2007). The Court of Appeals first held the agreement, as amended, was substantively unfair. *Id.* at 834-35. The court then held the agreement, as amended, was procedurally unfair. *Id.* at 835. The Court of Appeals reasoned that Gloria did not have the benefit of independent counsel, that her bargaining position was grossly imbalanced, and that "at no time did [she] have full knowledge of her legal rights." *Id.* Moreover, the court observed that because Gloria and Gehring believed the side letter dictated the subsequent

---

*See In re Marriage of Bernard*, 137 Wn. App. 827, 833, 155 P.3d 171 (2007) (observing, "[n]o court has yet determined the effect of *Pinkis* [*v. Network Cinema Corp.*, 9 Wn. App. 337, 512 P.2d 751 (1973)] in the context of a prenuptial agreement").

amendment and because the side letter was entered into within 24 hours of the wedding, the subsequent amendment did not remedy the agreement's procedural unfairness. *Id.* at 837.

¶12 We granted review. *In re Marriage of Bernard*, 163 Wn.2d 1011, 180 P.3d 1290 (2008).

## ANALYSIS

¶13 To determine the enforceability of a prenuptial agreement, this court undertakes a two-prong analysis. *In re Marriage of Matson*, 107 Wn.2d 479, 482-83, 730 P.2d 668 (1986); *see also In re Estate of Crawford*, 107 Wn.2d 493, 730 P.2d 675 (1986); *In re Marriage of Hadley*, 88 Wn.2d 649, 565 P.2d 790 (1977); *Friedlander v. Friedlander*, 80 Wn.2d 293, 494 P.2d 208 (1972); *Hamlin v. Merlino*, 44 Wn.2d 851, 272 P.2d 125 (1954). The burden of proof lies with the spouse seeking enforcement. *Friedlander*, 80 Wn.2d at 300.

¶14 Under the first prong, the court determines whether the agreement is substantively fair, specifically whether it makes reasonable provision for the spouse not seeking to enforce it. *Matson*, 107 Wn.2d at 482. If the agreement makes a fair and reasonable provision for the spouse not seeking its enforcement, the analysis ends; the agreement is enforceable. This is entirely a question of law unless there are factual disputes that must be resolved in order for a court to interpret the meaning of the contract. *In re Marriage of Foran*, 67 Wn. App. 242, 251 n.7, 834 P.2d 1081 (1992).

¶15 If, however, the agreement is substantively unfair to the spouse not seeking enforcement, the court proceeds to the second prong. Under the second prong, the court determines whether the agreement is procedurally fair by asking two questions: (1) whether the spouses made a full disclosure of the amount, character, and value of the property involved and (2) whether the agreement was freely entered into on independent advice from counsel with full knowl-

edge by both spouses of their rights. *Matson*, 107 Wn.2d at 483. If the court determines the second prong is satisfied, then an otherwise unfair distribution of property is valid and binding. *Id.* at 482.

¶16 Analysis under this second prong involves mixed issues of policy and fact, and accordingly review is de novo but undertaken in light of the trial court's resolution of the facts. *See Foran*, 67 Wn. App. at 251. On appeal, a trial court's findings of fact will be upheld if supported by substantial evidence. *Sunnyside Valley Irrigation Dist. v. Dickie*, 149 Wn.2d 873, 879, 73 P.3d 369 (2003). "Substantial evidence is evidence sufficient to persuade a fair-minded person of the truth of the declared premise." *In re Marriage of Hall*, 103 Wn.2d 236, 246, 692 P.2d 175 (1984).

¶17 We note as an initial matter that both parties request this court reconsider the above two-prong analysis, which was expressly set out in *Matson* and has character-ized our analysis for over 50 years. *See Hamlin*, 44 Wn.2d 851. Gloria argues that this court should undertake an approach that requires both substantive *and* procedural fairness; that is, she argues that a substantively unfair agreement should not be saved by procedural fairness. On the other hand, Thomas argues the substantive fairness prong should be abandoned altogether because RCW 26.09.080 already directs courts to make a "just and equi-table" distribution of property. We find it unnecessary to entertain these arguments because the prenuptial agree-ment at issue is both substantively and procedurally unfair, and the application of a different analysis would not alter the outcome here.

*The Agreement*

¶18 Turning to the agreement at issue, we apply the two-prong analysis to the prenuptial agreement as signed on the eve of marriage and subsequently amended 14

months later.[5] Thomas concedes the prenuptial agreement as originally executed on the eve of marriage was substantively and procedurally unfair; therefore, we must determine whether the later amendment cured the substantive or procedural deficiencies.

¶19 Under the first prong of our analysis, the agreement is enforceable if it is substantively fair. Here, the trial court concluded the agreement as amended was substantively unfair to Gloria. The Court of Appeals affirmed, reasoning that the amended agreement severely restricted the creation of community property, eliminating community property rights in the short term while permitting Thomas to enrich his separate property at the expense of the community. *Bernard*, 137 Wn. App. at 834. The Court of Appeals observed that the amended agreement provided nothing for Gloria from Thomas's separate property, nor reimbursed her for her contributions to Thomas's separate property, nor permitted maintenance, and it precluded any inheritance. *Id.* at 834-35.

¶20 Thomas argues that because this was a short-term marriage there was no time to accumulate community property. He urges us to alter our analysis and evaluate substantive fairness at the time of enforcement, as opposed to at the time of execution, of an agreement. We refuse. To do so would change the test from one of fairness to fortuity. We adhere to the settled rule that "[t]he validity of prenuptial agreements in this state is based on the circumstances surrounding the execution of the agreement." *In re Marriage of Zier*, 136 Wn. App. 40, 47, 147 P.3d 624 (2006) (citing *Matson*, 107 Wn.2d at 484).

¶21 Moreover, Thomas's substantial labor in managing his separate assets produced revenue that is considered community property. *See Hamlin*, 44 Wn.2d at 858; *see also* 19 Kenneth W. Weber, Washington Practice: Family and

---

[5] That this case involves a prenuptial agreement, amended postnuptially, does not alter our analysis. *See Hadley*, 88 Wn.2d at 654 (analyzing three *postnuptial* agreements under the established two-prong approach).

COMMUNITY PROPERTY LAW § 11.14, at 161-62 (1997). Thus, the premise of Thomas's argument is incorrect; community property accumulated during the marriage.

¶22 To be sure, "[t]here is nothing unfair about two well-educated working professionals agreeing to preserve the fruits of their labor for their individual benefit." *In re Marriage of DewBerry*, 115 Wn. App. 351, 365, 62 P.3d 525 (2003). However, an agreement disproportionate to the respective means of each spouse, which also limits the accumulation of one spouse's separate property while precluding any claim to the other spouse's separate property, is substantively unfair. *See Matson*, 107 Wn.2d at 486; *Friedlander*, 80 Wn.2d at 301.

¶23 Here, the community property consisted of half of Gloria's salary, which was controlled by Thomas, and in effect $100,000 of Thomas's earnings per year. In addition, the prenuptial agreement limited Gloria's inheritance rights, prevented Gloria from seeking spousal maintenance, prevented Gloria from using community property to assist her children, and sheltered Thomas from liability for any debts incurred by Gloria. CP at 1201-19. The prenuptial agreement as amended remedied some of these problems, but overall made provisions for Gloria disproportionate to the means of Thomas, and limited Gloria's ability to accumulate her separate property while precluding her common law or statutory claims on Thomas's property. CP at 1248-51. The agreement as amended is substantively unfair. It can be enforced only if it was executed fairly, the second prong of our analysis.

¶24 Under the second prong of our analysis, we ask whether the spouses fully disclosed the amount, character, and value of the property involved and whether the agreement was entered into voluntarily and intelligently. The trial court found Gloria had full knowledge of the amount, character, and value of Thomas's assets, and Gloria does not dispute this finding. However, the trial court found that, given the timing of Gloria's receipt of the working agreement draft in relation to the wedding and her

discussions with her attorney, the agreement was not entered into voluntarily or intelligently. The court further found that the subsequent side letter and amendment did not cure this defect, given the limited scope of negotiations.

¶25 Because the trial court made findings of fact about the agreement's lack of procedural fairness, we will uphold its findings if they are supported by substantial evidence. *Dickie*, 149 Wn.2d at 879. Here, substantial evidence supports the trial court's findings of fact regarding procedural unfairness. There was not enough time for Gloria or her attorney to adequately review the prenuptial agreement as evidenced by the late date at which a working draft was provided and the several distractions present for Gloria in the few days before the wedding. The evidence supports the trial court's finding that Gloria did not sign the July 7 prenuptial agreement "after receiving independent advice and with full knowledge of its legal consequences." CP at 1816.

¶26 The trial court then considered whether the amendment to the agreement executed by Gloria and Thomas, contemplated by the July 8 "side letter," cured the deficiencies of the July 7 agreement. The trial court found that the scope of negotiation was so limited that the amendment did not cure the defects of the agreement. Substantial evidence supports this conclusion, as demonstrated by the testimony of Gloria and Gehring, who both understood that the terms of the amendment were limited to the five areas of concern set forth in Gehring's July 7 letter to Gloria. And the wording of the side letter is additional evidence that any amendment was limited to the matters set forth in the "side letter," CP at 1256,[6] supporting the trial court's finding that the terms of the side letter limited renegotiation. CP at 1816 (Finding of Fact 27).

---

[6] The letter stated in pertinent part, "we and our attorneys will use their best efforts to negotiate in good faith and execute an amendment to the Agreement covering the following matters . . ." and then went on to discuss the five areas outlined in Gehring's letter. CP at 1256. It did not reference any other substantive changes to the prenuptial agreement.

¶27 The trial court observed that the side letter did not *expressly* limit the terms of the amendment to only the five areas of concern noted by Gehring and that the agreement as amended ultimately contained a matter outside the terms of the "side letter."[7] *Id*. Additionally, the deadline for renegotiation was abandoned. *Id*. But these observations do not negate the substantial evidence upon which the trial court based its finding regarding the limits of the amendment. Especially considering the trial court's ability to judge the weight and credibility of testimony, including Gloria's and her attorney's testimony that they understood the negotiations were limited, a fair-minded person would be persuaded that the side letter did not give Gloria a right to amend the prenuptial agreement beyond the few matters specified in the "side letter." The trial court's findings of fact in this regard are amply supported, and we will not disturb them on review. *See Dickie*, 149 Wn.2d at 879-80. We hold the agreement, as amended, was procedurally unfair.[8]

¶28 Because the prenuptial agreement was both substantively and procedurally unfair, it is unenforceable. We affirm the lower court's invalidation of the agreement.

*Attorney Fees*

¶29 The trial court awarded Gloria attorney fees and costs pursuant to RCW 26.09.140. In addition, the trial court awarded Gloria fees in advance of this appeal pursuant to *Stringfellow v. Stringfellow*, 53 Wn.2d 359, 333 P.2d 936 (1959).

---

[7] The amendment included a provision not contained in the "side letter" that further isolated Thomas's earnings from the marital community. Br. of Resp't at 21.

[8] The Court of Appeals appeared to rest at least some of its determination that there was procedural unfairness on a belief that Gloria's counsel was inadequate. *Bernard*, 137 Wn. App. at 836. Gloria did not make such an argument before this court or any court below. A discussion of counsel's adequacy is unnecessary to the resolution of this case because the trial court's findings are supported by substantial evidence without resort to consideration of the adequacy of counsel. We decline to entertain that question here.

¶30 In Thomas's second amended notice of appeal, he appeals both fee awards. However, he provides no supporting argument in his initial brief to the Court of Appeals or in his supplemental brief to this court. Instead, in his reply brief, Thomas argues that the prenuptial agreement, if valid, precludes an award of attorney fees and costs outside the context of arbitration. Gloria, on the other hand, consistently asked the Court of Appeals and this court to uphold both awards under RCW 26.09.140 and RAP 18.1(c).

¶31 "This court does not consider issues raised for the first time in a reply brief." *In re Marriage of Sacco*, 114 Wn.2d 1, 5, 784 P.2d 1266 (1990). We affirm the trial court's award of attorney fees and costs to Gloria and confirm the advance award of fees on appeal.

## CONCLUSION

¶32 We hold the prenuptial agreement, as amended, was substantively and procedurally unfair. We affirm the Court of Appeals. In addition, we affirm Gloria's award of attorney fees and costs, both at trial and on appeal.

ALEXANDER, C.J., and C. JOHNSON, MADSEN, CHAMBERS, and OWENS, JJ., concur.

¶33 SANDERS, J. (dissenting) — I agree with the majority that the prenuptial agreement, as amended, is substantively unfair and "can be enforced only if it was executed fairly, the second prong of our analysis." Majority at 905. However I disagree with the majority's conclusion that the amended agreement is also procedurally unfair (*id.* at 907) under the second prong. I would hold that the amended agreement is procedurally fair and thus enforceable. Therefore I dissent.

¶34 Under the second prong of our analysis we must determine whether a prenuptial agreement is procedurally fair by looking at (1) whether the spouses made a full disclosure of the amount, character, and value of the

property involved and (2) whether the agreement was freely entered into on independent advice from counsel with full knowledge by both spouses of their rights. *In re Marriage of Matson*, 107 Wn.2d 479, 483, 730 P.2d 668 (1986). If the second prong is satisfied then a prenuptial agreement is valid and binding. *Id.* at 482. I agree, as does the majority, with the trial court's finding that "Gloria had full knowledge of the amount, character, and value of Thomas's assets." Majority at 905. However, I disagree with the majority's assertion that the trial court's finding that Gloria did not voluntarily and intelligently enter into the prenuptial agreement is supported by substantial evidence. *Id.* at 905-06.

¶35  We review the totality of the circumstances to determine whether the spouse was "in a fair position to sign the agreement freely and intelligently." *Matson*, 107 Wn.2d at 485. Instructive to our inquiry is *In re Marriage of Knoll*, 65 Or. App. 484, 671 P.2d 718 (1983), which *Matson* presented as an exemplar of the procedural fairness analysis. *Matson*, 107 Wn.2d at 484.

In *Knoll*, the wife challenged the validity of the prenuptial agreement. The court found the agreement valid judged in light of the circumstances in the case and the wife's range of experience. Important facts in the court's decision were: (1) the wife was advised of the necessity of a prenuptial agreement at least 9 months before the wedding and knew and understood the purpose of the agreement; (2) she had been given a copy of the agreement at least 7 months before the wedding; (3) she was advised on numerous occasions by her husband's attorney to *seek* independent counsel; (4) she had an excellent understanding of her husband's assets because she handled the bookkeeping and payroll for her husband's businesses and was in charge of 10 of his business checking accounts; and (5) both parties had to reaffirm and sign the agreement 3 years later because they had lost the original document. The court decided that the failure to provide the wife with a detailed explanation of the agreement and her failure to follow advice and seek out independent counsel was offset by her knowledge and the procedural fairness provided her.

*Id.* at 484-85.

¶36 Similar substantive facts are present here: (1) Gloria was advised of the necessity of a prenuptial agreement from the outset of her betrothal to Thomas, (2) she had 14 months to renegotiate the agreement, (3) she was repeatedly advised to seek the advice of independent counsel and had independent counsel during the renegotiation period, (4) she had an excellent understanding of Thomas's assets because she worked for him, and (5) she reaffirmed the prenuptial agreement 14 months later. The only distinction is that in *Knoll* the spouse was given a copy of the agreement 7 months before the wedding, whereas Gloria had 14 months to renegotiate the agreement after the wedding. But this is a distinction without a difference because the entire prenuptial agreement was open to renegotiation. In sum that Gloria voluntarily and intelligently entered into the prenuptial agreement is supported by these facts.

¶37 Still the trial court found Gloria did not enter into the prenuptial agreement voluntarily or intelligently and that the amendment did not cure the defects of the agreement because the scope of the negotiation of the side letter was too limited. Clerk's Papers (CP) at 1815-16. The majority asserts these findings are supported by substantial evidence. Majority at 906. However, the majority concedes that the trial court found "the side letter did not *expressly* limit the terms of the amendment to only the five areas of concern noted by Gehring and that the agreement as amended ultimately contained a matter outside the terms of the 'side letter.' " *Id.* at 907. Additionally the deadline of the "side letter" was entirely abandoned. *Id.* The majority concludes, "a fair-minded person would be persuaded that the side letter did not give Gloria a right to amend the prenuptial agreement beyond the few matters specified in the 'side letter.' " *Id.*

¶38 However the side letter provided Gloria and Thomas would "use their best efforts to negotiate in good faith and execute an amendment to the Agreement covering the

following matters" but did not limit negotiation to *only* those matters.[9] CP at 249. In fact the amendment to the agreement contained a matter *outside* the terms of the "side letter," which benefited Thomas.[10] Gloria and her attorney should have realized that if Thomas amended the prenuptial agreement to contain a matter outside of the terms of the "side letter," then Gloria could have done so as well. That is what a fair-minded person would have surmised. The entire purpose of the "side letter" was to address Gloria's concerns with the prenuptial agreement, so substantial evidence does not support the trial court's finding that renegotiation was limited to the terms of the side letter.

¶39 Gloria did not use her best efforts to negotiate an amendment to the prenuptial agreement. A party to a prenuptial agreement must not keep back his or her reservations about the agreement. *In re Marriage of Cohn*, 18 Wn. App. 502, 569 P.2d 79 (1977). "Parties to a prenuptial agreement do not deal with each other at arm's length. Their relationship is one of mutual confidence and trust which calls for the exercise of good faith, candor and sincerity in all matters bearing upon the proposed agreement." *Friedlander v. Friedlander*, 80 Wn.2d 293, 301, 494 P.2d 208 (1972) (citing *Bauer v. Bauer*, 1 Or. App. 504, 464 P.2d 710 (1970)).

¶40 In *Cohn* spouses executed a prenuptial agreement and a settlement agreement. 18 Wn. App. at 503. Later the wife challenged the enforceability of both agreements "on the grounds that [she] did not sign them on independent advice and with full knowledge of her rights, and that a full disclosure had not been made to her of the amount, character and value of the property involved." *Id*. Rejecting the

---

[9] Words in a written agreement are given their "ordinary, usual, and popular meaning unless the entirety of the agreement clearly demonstrates a contrary intent." *Hearst Commc'ns, Inc. v. Seattle Times Co.*, 154 Wn.2d 493, 504, 115 P.3d 262 (2005).

[10] That this benefited Thomas does not defeat its logical consequence: the "side letter" did not preclude renegotiation of the prenuptial agreement.

wife's challenge, the court observed the spouses had discussed the prenuptial agreement months prior to their wedding, and "[a]lthough [the wife] testified that she felt rushed into signing the agreement, . . . she did not at any point indicate to the lawyer who had drafted it that she felt she was being rushed or that she was signing anything that she did not fully intend to sign." *Id.* at 506. The court reasoned if the wife did not understand the provisions or effect of the agreements "there [was] no evidence that she ever let her husband or the attorney know of her lack of knowledge. . . . [I]t would be unfair to penalize [the husband] for [the wife's] omission to request further information." *Id.* at 510 (citing *In re Marriage of Hadley*, 88 Wn.2d 649, 654, 565 P.2d 790 (1977)).

¶41 Similarly Gloria could have discussed her concerns about the prenuptial agreement while negotiating the terms of the amendment. But she did not. It is extremely unfair to Thomas to be penalized for Gloria's omission and failure to negotiate.

¶42 The prenuptial agreement, as amended, was substantively unfair but procedurally fair. As such I would hold the prenuptial agreement is enforceable and reverse the Court of Appeals.

¶43 Therefore, I dissent.

FAIRHURST and J.M. JOHNSON, JJ., concur with SANDERS, J.