# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In re the Matter of the Marriage of | ) | NO. 71017-6-I |
| | ) | |
| BARBARA G. KAYE, | ) | DIVISION ONE |
| | ) | |
| Respondent, | ) | |
| and | ) | |
| | ) | |
| KARL H. KAYE, JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | FILED: October 6, 2014 |
| | ) | |

LAU, J. — This case involves a marital dissolution action involving Karl and Barbara Kaye.[1] After a bench trial, the court invalidated the parties' prenuptial agreement on grounds of substantive and procedural unfairness, determined the marriage was defunct when Barbara moved out of the home, and ordered Barbara to pay three months of spousal maintenance. Karl appeals, arguing the prenuptial agreement's validity, the marriage's defunct date based on service of process date, and insufficient evidence for the maintenance award. Because the trial court properly concluded both substantive and procedural unfairness renders the agreement invalid,

---

[1] We refer to the parties by their first names to avoid confusion.

we affirm that determination. But because the court misapplied the legal standard for determining the date the marriage was defunct, we reverse the court's property distribution and maintenance award and remand for further proceedings on the existing factual record and consistent with this opinion. We affirm the decree of dissolution in part and reverse and remand in part.

## FACTS

The main facts are undisputed. Karl and Barbara Kaye married on July 12, 1984. Before the wedding, Karl presented Barbara with a prenuptial agreement. Barbara and Karl signed the prenuptial agreement two days before the wedding.

At the time of the agreement, Barbara disclosed a savings account, stock shares, real estate, and other personal property totaling approximately $111,900. She also earned $25,000 per year working for a local bank. Karl disclosed substantial assets primarily comprised of stocks and bonds and two waterfront Bainbridge Island rental properties. Karl's stocks and real estate assets, combined with life insurance policies and other personal property, totaled over $1 million. Karl has been unemployed since 1979. There was no expectation that he would look for work at the time he and Barbara married.

The prenuptial agreement mainly protected the parties' separate property even if it increased in value during the marriage or became commingled with community assets. For instance, paragraph 6 of the agreement provides:

> The assets presently owned by the parties . . . shall be and remain the separate property of each of the respective parties . . . . In addition thereto, any addition or enhancement in the value of the separate property of either party shall remain the separate property of each of the parties. Any additions to or enhancement in the value of separate property of either part which occurs due to major structural

-2-

improvements to said property shall be and remain the separate property of the party owning such separate property. In addition, any enhancement in the value of separate property . . . and the proceeds therefrom due to mere appreciation shall be and hereby remains the separate property of the party owning such separate property which has appreciated. In the event any community funds are utilized for the direct benefit of any separate property of either party, such community funds so utilized shall be deemed a gift of community property to the party owning the separate property benefited by such community funds.

Paragraph 6 also states, "[A]ssets acquired through the proceeds of loans secured by separate property shall be the separate property of the party whose property secured or was collateral for the loan." The clause meant that if the community received a loan, the party owning the property that secured the loan controlled the proceeds, but the community was liable for the debt.

The agreement also ensured that any proceeds derived from separate property would remain separate, while proceeds from wages or salaries became community property. Paragraph 7 states, "[A]ssets acquired during [the] marriage which are the proceeds of separate property shall retain the separate ownership and character of the assets from which said proceeds were originally derived." However, "any wages, salaries or other employment benefits attributable to the labor of either of them during such time that they shall be living together . . . shall be deemed community property."

Finally, the agreement waived the parties' rights to certain claims upon marriage dissolution or death of either party. Paragraph 8 provides:

[I]n the event of a dissolution of their marriage . . . each of them expressly waives any right or interest that he or she may have or subsequently acquire in the separate property of the other. In addition, if the separate property contains any community property investment or lien therein which is to be divided by reason of marriage dissolution, such separate property shall nevertheless be awarded to the party who owned said property as his or her own separate property notwithstanding any community investment therein.

-3-

Paragraph 9 contains similar provisions in the event that one of the parties died:

> Upon the death of either party, it is hereby contemplated and agreed by them that neither of them will claim any interest in the separate properties as defined herein of the other . . . . In addition, if any separate property of the deceased party contains any community investment, over which the surviving party would have the power to will one-half thereof, it is hereby expressly agreed between the parties that said separate property shall be awarded to the deceased party's heirs at law, or by will, whichever is applicable notwithstanding said community investment . . . . The parties also expressly waive any right he or she may have to claim a homestead and/or family allowance out of the separate real property of the other party, notwithstanding a potential community investment therein.

These clauses eliminate either party's potential claims to the other's separate property in the event of dissolution or death even if they invested community assets in that separate property.

The parties' trial testimony indicates that neither party fully understood the agreement's consequences when they signed it. For instance, when Karl was asked whether he was aware that paragraph 6 of the agreement meant that any community funds spent on his separate property was deemed a gift to him, Karl responded, "I am now, yes." Report of Proceedings (July 8, 2013) (RP) at 188. Later, counsel asked Karl whether he understood that if the community received a loan secured by his separate property that the loan proceeds were also a gift to him:

> Q. Well, it's in the prenuptial agreement that your attorney wrote. And you didn't understand it?
> A. If I—the way you're interpreting it I guess I didn't.

RP at 193-94. Karl also expressed confusion about other portions of the agreement:

> Q. At the time you never thought about whether it was fair or not?
> A. . . . .
> I didn't know anything about details as far as these paragraphs go. I had nothing to do with drafting the logic of it. I didn't know the logic of it. I've never seen a prenuptial agreement in my life up to that point . . . .

I didn't know anything special about these gifts and other things. I didn't know that concept. I didn't—it wasn't part of my thinking.

. . . .

Q. If you'll look at paragraph 9 of the agreement, sir, were you aware that that paragraph was in there and what it meant?

A. I—I probably wasn't—yeah. When I signed this I read this thing too, you know, just like Barb did, so I was aware of it at that point in time.

Q. Did you know what it meant?

A. I don't know what it means now.

RP at 201–03.

Barbara was indifferent about the agreement when she signed it. She testified that when Karl first gave her the agreement, he said it was a "normal, standard" agreement. RP at 124. Karl denied the statement. She also testified that Karl told her "not to worry about [the agreement]." RP at 123. As she understood it, "[the agreement] didn't matter because he said he had enough money to take care of whatever he needed to take care of . . . there wouldn't be any requirement for me to gift money to fix the house or do anything with the house. . . . He had his, I had mine. It was going to be separate." RP at 128. Given this understanding of the agreement, she "didn't care" about certain details in the agreement, such as the accuracy of asset disclosures. RP at 113.

Barbara said she read the agreement, understood she could talk to a lawyer, considered it, but decided against it. She recalled receiving the agreement approximately two weeks before the wedding. Karl thought it was "more like a month." RP at 148.

After 27 years of marriage, Barbara moved out of their Bainbridge Island residence on March 25, 2011. From March 31, 2011, through April 12, 2012, Barbara and Karl attended couples therapy twice a month with a psychologist. Karl suggested

counseling, with the hope of reconciling their marriage. He believed the marriage could be saved until Barbara served him with divorce papers in June 2012, over a year after they started counseling.

Following a bench trial, the trial court found the prenuptial agreement both substantively and procedurally unfair at the time it was signed. "Substantively, the agreement must make adequate provision for the spouse not seeking enforcement and it does not. The agreement is completely one-sided and was unfair at the time it was entered into." The court also found the agreement procedurally unfair because neither party "understood the significance of the Agreement when it was entered into. . . . [N]either party entered into the Agreement with full understanding of its provisions or their significance." Further, because Barbara did not receive independent legal advice, she "did not have full knowledge of her rights [and] the legal consequences of the agreement."

The trial court also found their marriage defunct as of March 23, 2011—the date Barbara moved out of their house. As a consequence, the court characterized Barbara's stock and the subsequently accumulated value of her 401(k) as her separate property rather than community property.

The trial court also awarded Karl three months of spousal maintenance. The court explained this award by noting Karl's extended unemployment, his substantial separate property, including his Bainbridge Island residence valued at $1.2 million,[2] and Barbara's limited separate assets and inability to pay for her own expenses and save for

---

[2] Karl sold his other Bainbridge Island rental properties in 2003.

-6-

her retirement. Therefore, the maintenance award was intended to sustain Karl until he could "do something" to provide for himself with his separate assets. RP at 337.

## ANALYSIS

### Standard of Review

Whether a prenuptial agreement is substantively fair is a question of law reviewed de novo "unless there are factual disputes that must be resolved in order for a court to interpret the meaning of the contract." In re Marriage of Bernard, 165 Wn.2d 895, 902, 204 P.3d 907 (2009). Similarly, whether a prenuptial agreement is procedurally fair "involves mixed issues of policy and fact, and accordingly review is de novo but undertaken in light of the trial court's resolution of facts." Bernard, 165 Wn.2d at 903. "Findings of fact are reviewed under a substantial evidence standard, defined as a quantum of evidence sufficient to persuade a rational fair-minded person the premise is true." Sunnyside Valley Irr. Dist. v. Dickie, 149 Wn.2d 873, 879, 73 P.3d 369 (2003).

### Enforceability of Prenuptial Agreement

This court undertakes a two-pronged analysis to determine whether a prenuptial agreement is enforceable. First, "the court determines whether the agreement is substantively fair, specifically whether it makes reasonable provision for the spouse not seeking enforcement." Bernard, 165 Wn.2d at 902. If the court finds that the agreement contains "a fair and reasonable provision for the spouse not seeking its enforcement, the analysis ends; the agreement is enforceable." Bernard, 165 Wn.2d at 902.

Second, if the court finds that a prenuptial agreement is substantively unfair, it may nevertheless enforce the agreement if it was procedurally fair when executed. In re Marriage of Matson, 107 Wn.2d 479, 483, 730 P.2d 668 (1986). An agreement is procedurally fair if (1) the spouses made a full disclosure of the amount, character, and value of the property involved and (2) the agreement was freely entered into on independent advice from counsel with full knowledge by both spouses of their rights. Matson, 107 Wn.2d at 483. For both substantive and procedural fairness, appellate courts must limit their analysis to the circumstances surrounding the execution of the agreement rather than the parties' circumstances throughout the marriage or at the time of enforcement. Bernard, 165 Wn.2d at 904. "The burden of proof lies with the spouse seeking enforcement." Bernard, 165 Wn.2d at 902 (citing Friedlander v. Friedlander, 80 Wn.2d 293, 300, 494 P.2d 208 (1954)). Here, the burden rests on Karl.

Substantive Fairness

For substantive fairness, courts have considered several factors for determining whether an agreement fairly provides for the spouse not seeking enforcement, including: (1) the proportional benefit between the parties, (2) restrictions on the creation of community property, (3) prohibitions on the distribution of separate property upon dissolution, (4) the economic means of each spouse, (5) preclusion of common law and statutory rights to both community and separate property upon dissolution, (6) limitations on inheritance, (7) prohibitions on awards of maintenance, and (8) limitations on the accumulation of separate property. See, e.g., Bernard, 165 Wn.2d at 905 ("[A]n agreement disproportionate to the respective means of each spouse, which also limits the accumulation of one spouse's separate property while

-8-

precluding any claim to the other spouse's separate property, is substantively unfair."); Matson, 107 Wn.2d at 486 (holding that a prenuptial agreement was "grossly disproportionate" where all value, income, and earnings from separate property would remain separate upon dissolution); In re Marriage of Foran, 67 Wn. App. 242, 249–50, 834 P.2d 1081 (1992) ("Peggy waived any and all equitable liens which the marital community might otherwise acquire by virtue of the expenditure of community funds or community labor on or for the benefit of James' separate estate. Peggy also waived all of her statutory rights as a surviving spouse in the event that James should predecease her. She also waived any right to make a claim against James' separate estate in the event of a marital dissolution. . . . There was no contractual requirement that the marital community be reimbursed for the value of any financial contributions and personal services it might contribute to James' separately owned businesses.").

In this case, paragraphs 6, 7, 8, and 9 of the prenuptial agreement implicate several of these factors. For instance, paragraph 6 of the agreement quoted above states that separate property shall remain separate even if its value increases or it is comingled with community funds. It also states that the owner of property securing a community loan controls the proceeds of the loan. Paragraph 7 states that the proceeds of separate property remain separate. But the proceeds from salaries or wages of either party's labor is community property.

In the context of the parties' economic means at the time of execution, these paragraphs limited the accumulation of community property and disproportionately benefited Karl. When Barbara and Karl married, Barbara owned modest property assets. Her primary source of income was the salary she earned working for a local

bank. Conversely, Karl owned substantial property assets and various real estate investments, stocks, and bonds that generated his primary source of income. He had not worked for years, and there was no expectation that he would work during the marriage. By its terms, the agreement essentially ensured that Karl's property would always remain separate. Under paragraphs 6 and 7 of the agreement, Karl's substantial property assets and its proceeds remained his separate property even if those assets increased in value or became commingled with community assets. Any community funds that directly benefited separate property would be deemed a "gift." There was no requirement that a party be reimbursed for community or separate funds "gifted" to the other party. We previously invalidated a similar prenuptial agreement for the same reason. Foran, 67 Wn. App. at 250 ("There was no contractual requirement that the marital community be reimbursed for the value of any financial contributions and personal services it might contribute to [separate property].").

Karl argues that the agreement did not preclude the accumulation of community property because of paragraph 7(C), which provides, "[A]ny wages, salaries or other employment benefits attributable to the labor of either of them . . . shall be deemed community property." We are unpersuaded. Barbara was the only wage earner at the time they signed the agreement. The parties understood that Karl would never be gainfully employed during the marriage. Under these circumstances, paragraph 7 prevented the accumulation of community property. It ensured that Karl would retain an interest in half of Barbara's salary or any assets obtained with the proceeds of her salary. Further, no other clause in the agreement expressly designates any assets as community property. By the agreement's terms, the only sources of community

property are wages, salaries, and employment benefits—assets that only Barbara was expected to contribute when they signed the agreement.

Karl claims that a provision in the agreement "treats contributions of separate property to the community as gifts." Br. of Appellant at 10. We are unpersuaded. The agreement contains no such provision. Most of the agreement ensures that separate property remains separate. See, e.g., paragraph 7(B) ("The parties agree that the commingling of their separate property shall not change the character and/or ownership of said separate property."). The agreement does retain the parties' ability to receive gifts from one another. But it does not require that any gifts be made to the community. While Karl contemplated contributing separate property to the community at the time of execution, no provision in the agreement required any contribution from his separate property. It expressly treated salaries, wages, and employment benefits as sole community property. Even though Karl may have contributed some separate property to the community during the marriage, we consider only the circumstances surrounding the execution of the agreement, not what transpired afterward. Bernard, 165 Wn.2d at 904.

The agreement also precludes any equitable liens or statutory claims against separate property in the event of dissolution or death of a party. Paragraphs 8 and 9 ensure that the parties waive any right or interest in the other party's separate property in the event of dissolution or death, even if that separate property includes a community investment. Courts have consistently invalidated prenuptial agreements with similar waivers. See, e.g., Bernard, 165 Wn.2d at 905 ("[The agreement] made provisions for Gloria disproportionate to the means of Thomas, and limited Gloria's ability to

accumulate her separate property while precluding her common law or statutory claims to Thomas's property."); Foran, 67 Wn. App. at 250 (invalidating a prenuptial agreement containing waivers as to any equitable lien and statutory rights upon dissolution or death).

Given the parties' economic circumstances at the time of execution, the agreement disproportionately favors Karl, restricts the creation of community property, prohibits the distribution of separate property upon dissolution, limits inheritance rights, and precludes statutory rights upon dissolution or death. We conclude, as a matter of law, that the agreement was substantively unfair when it was signed. In Foran, we invalidated a prenuptial agreement containing the same factors present here. Foran, 67 Wn. App. at 250–51.

Karl nevertheless argues that the agreement is substantively fair. We are not persuaded. First, Karl alleges that no substantial evidence supports the trial court's finding that "[t]he agreement is completely one sided and was unfair at the time it was entered into." This "finding" is a legal conclusion, not a finding of fact. "When findings of fact in reality pronounce legal conclusions, they may be treated as such." State v. Niedergang, 43 Wn. App. 656, 659, 719 P.2d 576 (1986). For the reasons discussed above, the trial court properly concluded the agreement was "one-sided" and unfair when signed.

Karl next argues that the trial court "erroneously focused on post nuptial circumstances as they developed as of trial . . . rather than when executed." Br. of Appellant at 18. Karl relies on a portion of the trial court's oral decision describing the agreement as

a one-way street wherein the wife ended up liquidating all of her separate property, put all of her community earnings to service a debt on this separate property house, along with obviously the other community debt, ended up having no retirement and ostensibly no interest in the equity in the house, yet was stuck with the mortgage liability and her name on the mortgage.

RP (July 10, 2013) at 319–20. Karl claims that this shows the trial court misapplied the legal test by focusing on the circumstances of the marriage rather than the circumstances surrounding the execution of the agreement. See Bernard, 165 Wn.2d at 904 (appellate courts must limit their analysis to the circumstances surrounding the execution of the agreement rather than the parties' circumstances throughout the marriage or at the time of enforcement).

But the court's comments have "no final or binding effect, unless formally incorporated into the findings, conclusions, and judgment." Ferree v. Doric Co., 62 Wn.2d 561, 567, 383 P.2d 900 (1963). Second, the court properly concluded that the agreement was unfair "at the time it was entered into." "To the extent its oral rulings conflict with its written order, a written order controls over any apparent inconsistency with the court's earlier oral ruling." State v. Skuza, 156 Wn. App. 886, 898, 235 P.3d 842 (2010).

Procedural Fairness

A substantively unfair prenuptial agreement can be enforced only if it was procedurally fair. Bernard, 165 Wn.2d at 905. An agreement is procedurally fair if (1) the spouses made a full disclosure of the amount, character, and value of the property involved and (2) the agreement was freely entered into on independent advice

from counsel with full knowledge by both spouses of their rights. Matson, 107 Wn.2d at 483.

The trial court ruled that the agreement's asset disclosures were sufficient.[3] It found, however, that the agreement was procedurally unfair because (1) neither party understood what was in the agreement and (2) Barbara did not receive independent legal advice.

Karl challenges two factual findings underlying the trial court's conclusion that the prenuptial agreement was procedurally unfair. This court will uphold a trial court's factual findings if they are supported by substantial evidence. Sunnyside Valley 149 Wn.2d at 879. First, Karl challenges the court's finding that "neither party entered into the Agreement with full understanding of its provisions or their significance." However, this finding is supported by substantial evidence summarized above.

Second, Karl challenges the court's finding that Barbara had only two weeks to review the prenuptial agreement and seek independent legal advice. This finding is supported by substantial evidence. Barbara testified that she thought she received the agreement two weeks before the wedding. Karl testified that he thought "it was more like a month." RP at 148. Karl's argument relates to matters of credibility. We defer to the trier of fact for purposes of resolving conflicting testimony and evaluating the

---

[3] Barbara disputes this finding on appeal, arguing that Karl violated his duty of good faith and candor by failing to disclose the value of certain assets. We decline to address whether Karl failed to properly disclose the value of his contingent interests. Barbara failed to cross appeal and therefore cannot dispute the trial court's findings or assign error. See Amalgamated Transit Union Local 587 v. State, 142 Wn.2d 183, 202, 11 P.3d 762 (2000).

persuasiveness of the evidence and credibility of the witnesses. Boeing v. Heidy, 147 Wn.2d 78, 87, 51 P.3d 793 (2002).

Karl also argues that Barbara's decision to forgo independent legal advice does not defeat procedural fairness. We consider several factors when determining whether a prenuptial agreement was freely entered into with full knowledge of the parties' rights, including "[t]he bargaining positions of the parties, sophistication of the parties, presence of independent advice, understanding of the legal consequences and rights, and timing of the agreement juxtaposed with the wedding date . . . ." Matson, 107 Wn.2d at 484. Karl correctly notes that independent counsel is not a prerequisite for procedural fairness. See, e.g., In re Estate of Crawford, 107 Wn.2d 493, 496, 730 P.2d 675 (1986) ("There is no absolute requirement of independent counsel."); see also Kellar v. Estate of Kellar, 172 Wn. App. 562, 588, 291 P.3d 906 (2012) ("First, we cannot say that effective independent counsel is required when independent counsel is not even required in all cases."). However, courts have found prenuptial agreements procedurally unfair when the party challenging enforcement received no advice from independent counsel and the agreement was patently unreasonable. See, e.g., Crawford, 107 Wn.2d at 497 ("Here the agreement was patently unreasonable. Independent counsel was required."); see also Foran, 67 Wn. App. at 256–57 (holding that independent counsel was required because the agreement was patently unreasonable).

As in Crawford and Foran, the agreement here is patently unreasonable. It allows Karl to enrich his separate property with community funds without requiring that he reimburse the community or otherwise contribute to the community. Therefore, even

-15-

though Barbara chose not to seek legal advice, the trial court correctly found that the agreement was procedurally unfair because Barbara was ill equipped to identify its patently unreasonable terms on her own. See Foran, 67 Wn. App. at 256 ("That the Crawford prenuptial contract was patently unreasonable is something that Genevieve Crawford was ill equipped to determine on her own. Peggy Foran was similarly ill equipped to make that determination . . . .").

Karl's attempt to distinguish this case from others where the prenuptial agreement was introduced shortly before the wedding is unpersuasive. See, e.g., Matson, 107 Wn.2d at 486 (finding procedural unfairness where the agreement was introduced three days before the wedding). He contends that because their wedding lacked the traditional formality of some weddings, Barbara did not have to face the difficult choice of either signing an agreement she did not understand or postponing a significant life event. The amount of time between when the parties review the agreement and the wedding date is only one factor. Courts have invalidated prenuptial agreements even where the party had more than a few days to review the document. In Bernard, for example, the court found that the prenuptial agreement was procedurally unfair even though the party challenging its validity received it 18 days before the wedding. Bernard, 165 Wn.2d at 899.[4]

Whether the agreement was procedurally fair depends on whether the agreement was freely entered into on independent advice from counsel with full knowledge by both spouses of their rights. Matson, 107 Wn.2d at 483. Substantial

---

[4] The court invalidated the agreement because, although Gloria had an accurate draft 18 days before the wedding, her attorney did not receive an accurate draft until 3 days before the wedding. Bernard, 165 Wn.2d at 899–900.

evidence supports the trial court's finding that neither party understood their rights under the agreement. Further, the agreement is not procedurally fair simply because Barbara had the opportunity to seek independent counsel but chose not to. Here, independent counsel was required because the agreement was patently unreasonable.

### The Marriage Defunct Date

Karl challenges the trial court's conclusion that the marriage was defunct when Barbara moved out of their Bainbridge Island residence on March 23, 2011. The date of legal separation implicates the community value of Barbara's 401(k) and whether the restricted Columbia Bank stock is her separate property.

"When spouses or domestic partners are living separate and apart, their respective earnings and accumulations shall be the separate property of each." RCW 26.16.140. Mere physical separation is not enough for the statute to apply; the marriage must be "defunct." Rustad v. Rustad, 61 Wn.2d 176, 180, 377 P.2d 414 (1963). For a marriage to be defunct, there must be "some conduct on the part of both spouses" demonstrating that the marriage is over. Seizer v. Sessions, 132 Wn.2d 642, 658, 940 P.2d 261 (1997):

> A marriage is considered "defunct" when both parties to the marriage no longer have the will to continue the marital relationship. In other words, when the deserted spouse accepts the futility of hope for restoration of a normal marital relationship, or just acquiesces in the separation, the marriage is considered "defunct" so that the "living separate and apart" statute applies.

Seizer, 132 Wn.2d at 658 (quoting In re Marriage of Short, 125 Wn.2d 865, 871, 890 P.2d 12 (1995)).

Contrary to Rustad and Seizer, the trial court considered only Barbara's conduct when it determined the marriage was defunct on March 23, 2011, when she moved out of their house.[5]

Because the trial court erred when it found that the marriage was defunct on March 23, 2011, we reverse both the property distribution and maintenance award. We remand for further proceedings, based on the existing factual record, to determine the correct date the marriage became defunct.[6] Accordingly, we need not address the trial court's evaluation or characterization of Barbara's 401(k) or stocks.

## CONCLUSION

For the reasons discussed above, we affirm the trial court's determination to invalidate the prenuptial agreement. But because the court misapplied the legal standard for determining the date the marriage was defunct, we reverse the property distribution and maintenance award and remand for further proceedings on the existing

---

[5] In defense of the trial court's finding, Barbara relies heavily on In re Marriage of Pletz, 71 Wn. App. 699, 861 P.2d 1080 (1993). However, we do not consider the relevance of that case because the Supreme Court ordered the opinion be depublished. In re Marriage of Pletz, 123 Wn.2d 1026, 873 P.2d 489 (1994).

[6] We are not certain on remand what, if any, impact the defunct marriage date might have on the court's characterization and overall distribution of the parties' property, including Barbara's 401(k) and stocks and the maintenance award. One of the statutory factors a court must weigh to determine the maintenance award includes the parties' resources, including separate or community property. Thus, we decline to address Karl's challenge to the maintenance award.

factual record and consistent with this opinion. We affirm in part and reverse and remand in part.

WE CONCUR: