# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION  II

| | |
|---|---|
| In re the marriage of: | No.  52160-1-II |
| BRENDA A. WILSON, | |
| Appellant/Cross-Respondent, | |
| and | UNPUBLISHED OPINION |
| GARY W. WILSON, | |
| Respondent/Cross-Appellant. | |

SUTTON, A.C.J. — This appeal arises from Brenda and Gary Wilson's prenuptial agreement, the dissolution of their marriage, and the trial court's final orders.  During their marriage, they acquired rental investment properties as community property.  After their separation, Brenda managed the rental properties.  Prior to trial, the court appointed Acuity Forensics, owned by Tiffany Couch, to perform an accounting of the rents received and the expenses paid for the rental properties and ordered the parties to provide the relevant documentation to determine any net lost profit and proceeds.  Couch later presented an accounting based on the fair market rental value of the properties.  Brenda also hired an expert, Heidi Bowen, who provided an accounting based on the actual rental deposits.  After a lengthy bench trial, the trial court entered final orders.  Brenda appeals and Gary cross-appeals.

We affirm in part and reverse in part. We affirm (1) the trial court's finding that Brenda's net monthly income is $12,000 for child support, and (2) the court's ruling adopting Couch's accounting for purposes of determining the amount of net lost profit and proceeds owed by Brenda to Gary for their community investment rental properties. We reverse (3) the provisions of the child support order related to deviation from the standard child support calculation and the court's decision not to order a transfer payment from Brenda to Gary. We also reverse (4) the provisions of the final dissolution order related to the distribution of the community estate, and (5) the portion of the money judgment entered in favor of Gary related to the offset of $39,000. We deny Brenda's request for an award of appellate attorney fees and costs.

We reverse in part and remand for further proceedings consistent with this opinion. On remand, we order the court to (1) make sufficient written findings of fact to support any deviation from the standard child support calculation and to reconsider its decision to deny any transfer payment from Brenda to Gary, and to amend the child support order accordingly, (2) reconsider the distribution of the community estate and equalize the division of it as equally as possible, and (3) strike the $39,000 offset and amend the money judgment accordingly.

## FACTS

### I. BACKGROUND FACTS

A. SEPARATION AND DISSOLUTION

The Wilsons married in 1999, Brenda separated from Gary on December 28, 2012, and the petition for dissolution of marriage was filed on February 7, 2013. At the conclusion of the trial,

the parties had two sons, ages 11 and 14.[1]  Brenda worked as a real estate agent, and Gary worked

for U.S. Fish and Wildlife Service.  Prior to marriage, the parties signed a prenuptial agreement.

B.  THE PRENUPTIAL AGREEMENT

1.  Separate Property

The parties entered into a prenuptial agreement when they were married.  The prenuptial

agreement established that the assets and liabilities that each party entered into the marriage with

would remain their own separate property.  The parties agreed to be "completely independent of

the other" and that they were entitled to "manage, enjoy, encumber, hold, sell, convey, gift, lease

and dispose of all their separate properties" without the consent of the other.  Ex. 1 at 3.  These

separate assets included their cash and bank accounts, their personal properties, real property, life

insurance policies, retirement accounts, and Brenda's business.  Gary's separate property totaling

$394,946.95 is listed in Schedule A to the prenuptial agreement as follows:

SCHEDULE "A"

Cash and Bank Accounts:

| | |
|---|---|
| Pacific Northwest Federal Credit Union, Savings Acct. XXX166 | $   158.22 |
| Citizens National Bank, Savings Acct. # XXX932 | 528.92 |
| Columbia Credit Union, Savings Acct. # XXX538 | 2,123.27 |
| Yakima Valley Credit Union, Savings Acct. # XXX9 | 13,948.46 |

Personal Properties:

| | |
|---|---|
| Household goods and furnishings | 12,500.00 |
| Jewelry | 21,345.00 |
| Old coin and paper money collection | 1,408.73 |
| Sporting goods/camera/tools/equipment | 16,450.00 |

---

[1] The parenting plan is not an issue on appeal.

| | |
|---|---|
| 1966 Ford F250 pickup, Wash. License # T61900 | 3,000.00 |
| 1991 Ford Explorer, Wash. License # 597EUP | 8,000.00 |

Real Property:

| | |
|---|---|
| The property located at XXXX N.E. 52nd Ct., Vancouver, Washington: | 226,900.00 |

Life Insurance Policies:

| | |
|---|---|
| Group life insurance through employer (face value varies with income) | no cash value |

Retirement Accounts:

| | |
|---|---|
| Thrift Savings Plan for Federal Employers | 88,584.35 |

Ex. 1 at Schedule A.

Brenda's separate property totaling $74,094.85 is listed in Schedule B to the prenuptial agreement as follows:

SCHEDULE "B"

Cash and Bank Accounts:

| | |
|---|---|
| Wells Fargo, Checking Acct. # XXXXXXX4-27 | $1,733.41 |
| Columbia Credit Union, Savings Acct. #XXX274 | 50.00 |

Personal Properties:

| | |
|---|---|
| Household goods, furnishings and jewelry | 2,000.00 |
| 1999 Subaru Forestor, Wash. Lic. #WQG988 | 19,500.00 |
| Camera | 200.00 |

Life Insurance Policies:

| | |
|---|---|
| First Investors (whole life policy) – cash value | 611.44 |

Business:

| | |
|---|---|
| 1/3 ownership in Right Now Employment, Inc. (probable increase to 50% in approximately two months from date of this Agreement) | 50,000.00 |

Ex. 1 at Schedule B.

4

2.  Reimbursement Claim

The prenuptial agreement also precluded each party from making a claim for reimbursement against the separate property of the other.

> [N]either party shall claim a right of reimbursement for any labor, materials, money or the like contributed to or on behalf of the separate property of the other party and any such contribution shall be considered either a de minimis contribution, a gift to the other party, or that the community has received a compensating benefit from the use of the property to or which the contribution was made.

Ex. 1 at 5.

3.  Presumption–Separate Property

Under Section VI of the agreement, there is a presumption that

> [F]rom time to time [] third parties may require that both parties' names be placed on the title to a piece of separate property for purposes such as obtaining financing or refinancing in a community property state or for other reasons. In the event this shall occur, such event will not cause that effected party's separate property to become common or community property and the separate value of the property shall continue unless both parties acknowledge, in a separate writing, that it is the intent of the parties that the separate property so affected shall become common or community property of the parties.

Ex. 1 at 8.

4.  Community Property Acquired After Marriage

Under Section X of the prenuptial agreement, there is a presumption that "[f]rom time to time the parties my desire to own property in the form of community property, tenancies in common property, and join tenancy property." It goes on to state that

> [i]n the event common or community property is created, it shall be managed according to the laws concerning management of common or community property. Common or community property shall be subject to the laws of intestate succession concerning common or community property

Ex. 1 at 8.

To create community property under the agreement, the parties must either "(a) acquire the property in both parties' names; (b) purchase it from a common bank account; or (c) execute a written agreement so classifying the property." Ex. 1 at 8.

5. Other Provisions Related to any Claim and Property Distribution

Section XVII of the agreement, entitled "Distribution Upon Dissolution" states in relevant part,

> 1. Neither party shall make any claim whatsoever and neither party is entitled to, nor will receive any award of or from the separate property and/or estate of the other. . . ;
>
>  . . . .
>
> 4. In dividing assets and liabilities of their marital community, the separate property of each party shall not be taken into account directly or indirectly;
>
> 5. The parties' community assets and debts shall be *divided as equally as possible*;
>
>  . . . .

Ex. 1 at 14-15 (emphasis added).

C. COMMUNITY PROPERTY–THE INVESTMENT RENTAL PROPERTIES

During their marriage Gary and Brenda acquired multiple rental investment properties as community property which properties are listed below.

| | Community Real Property |
|---|---|
| 1 | XXXX Robin Court, Redmond, OR 97756 |
| 2 | XXXX NE 37th Street, Vancouver, WA 98661 |
| 3 | XXXX SE Columbia River Dr., Vancouver, WA 98661 |
| 4 | XXXX SE Columbia River Dr., Vancouver, WA 98661 |
| 5 | XXX SE Fairwinds Loop, Vancouver, WA 98661 |

Clerk's Papers (CP) at 17-18. The parties also acquired a family residence together (NW 209th Street).

D. ACCOUNTING OF RENTAL PROPERTIES

From the date of separation, December 28, 2012, until the date of trial, June 22, 2017, the parties continued to collect rents and pay expenses on their community investment properties. Brenda managed the properties, although not in an organized or cooperative manner. As a result, on March 25, 2016, the trial court entered an order appointing Acuity Forensics, owned by Couch, to "determine the rents received and expenses paid (or owing) between May 1, 2013 and February 29, 2016" for the five community real estate investment properties. CP at 105.[2] The parties were ordered to "provide to the professional whatever records of rents received and expenses paid since May 1, 2013 for each separate property within seven . . . days of the retainer of the professional," and to "act with due diligence and good faith in responding to any request that the professional deems reasonably necessary and proper to accounting as ordered herein." CP at 106. "For each separate real estate investment identified above, the professional shall determine the net amount actually received by each party and the amount actually paid by each party for any 'expenses' for each separate real estate investment between May 1, 2013 and February 29, 2016." CP at 106.

Couch is a certified public accountant, certified in financial forensics, and certified as a finance examiner. She has been an accountant for over 19 years, with 10 of those years in Clark County. "Her expertise is in matters involving fraud investigation, forensic accounting, contract and regulatory compliance, internal control risk assessment, and complex litigation." CP at 136. Couch has been retained many times for forensic accounting and to provide expert witness testimony in litigation.

---

[2] This became known as "Accounting Period 1." In October 2016, the court ordered "Accounting Period 2" from March 1, 2016 through February 28, 2017.

1. Couch's Accounting—Fair Market Rental Value

On June 15, 2017, Couch provided the court and parties with her report. It was organized by property and established the rents received and expenses paid for each rental unit. Couch based her accounting of the income received from each rental unit using lease agreements, all known expenditures—including mortgage payments, property tax payments, and home ownership association dues. Couch noted that when documents were missing, she used estimates based on known income and expenditures. She also relied on statements from the parties and tax-related documents. Couch stated that while the report may not include all actual expenses and that including them "would change the findings in th[e] report, it [was her] professional opinion that those changes would not substantially or materially change the findings" of the report. CP at 253. She also noted that "the [m]arital [e]state is not being reimbursed for rents in a unit being used by Brenda Wilson; and another unit is being offered for free to Brenda Wilson's clients without any consideration to the [m]arital [e]state." CP at 253.

In sum, Couch calculated how much each party received from the rental incomes, as well as how much each party spent on the properties from their separate property accounts. She concluded that as of June 15, 2017, Brenda owed Gary $64,756.31 in lost fair market proceeds and profits. In November, Couch updated her report based on information regarding the actual fair market rents for two of the rental properties. She concluded that if fair market rent had been charged for those two properties between May 2013 and March 2017, the parties would have received an additional $116,375.67 in rental income. As a result, Couch concluded that Brenda owed Gary $71,243.78 through March 2017.

## 2. Brenda Retains Separate Accounting Expert

Brenda hired her own expert, Bowen, who is also a certified public accountant and a certified fraud examiner. Bowen completed her reporting based on input from Brenda and the actual rent deposits from May 2013 to February 2017. Bowen concluded that Gary owed Brenda $29,653.55. Bowen's conclusion was based on the same period of time covered by Couch's amended report. The two experts had differing calculations for one of the two Columbia Drive properties. Couch relied on the fair market rental income and profits, while Bowen calculated the rental income based on bank deposits or the amount reported from Brenda—this resulted in a difference of $52,000 in rental income between the two reports.

## II. TRIAL AND FINAL ORDERS

Trial commenced on March 20, 2017, and lasted for 16 days. The key issues before the court were (1) the parties' net monthly income for child support based on a 50/50 residential schedule, (2) the property division and whether the prenuptial agreement was valid, (3) the amount of lost net profit from the rental properties that Brenda managed after their separation until trial, and (4) the characterization of the $70,000 payment Gary made to his father related to work performed on the rental properties and whether Gary owed Brenda an offset. The court orally ruled on April 18, 2018, and entered written findings of fact, conclusions of law, and final orders on June 12, 2018.

## A. PRENUPTIAL AGREEMENT

The trial court found that the prenuptial agreement "afforded the parties the opportunity to accumulate community property during their marriage, which they did to a great extent, while at the same time allowing them to retain earnings as their separate property to manage as they saw

fit." CP at 17. Accordingly, the court ruled that "[t]he prenuptial agreement is valid and enforceable in these proceedings." CP at 17. Under the prenuptial agreement, the court had the authority to distribute the parties' community property and was required to divide it as "equally as possible." Ex. 1 at 15.

B.  DIVISION OF THE SEPARATE PROPERTY

Consistent with the prenuptial agreement, the trial court awarded to Gary his separate property listed in Schedule A of the agreement, including the Solarity account, and awarded to Brenda her separate property listed in Schedule B of the agreement.

C.  DIVISION OF THE COMMUNITY PROPERTY

At trial, the parties' community property consisted largely of their rental properties and their family home, which was awarded as follows:

| Real Property | Awarded to Gary | Awarded to Brenda | Value |
|---|---|---|---|
| NW 209th Street | X | | $308,000 |
| Robin Court (Eagle Crest) | X | | $291,000 |
| NE 37th Street | | X | $185,000 |
| SE Columbia River Drive (1) | | X | $214,700 |
| SE Columbia River Drive (2) | | X | $172,300 |
| SE Fairwinds Loop | | X | $123,077 |
| **Total:** | **$599,000** | **$695,077** | |

CP at 17-18, 23, 26-27.

The court also awarded the following as community property:

| Property | Awarded to Gary | Awarded to Brenda | Value |
|---|---|---|---|
| Gary's retirement (Federal Employee Retirement System pension) between the dates of marriage and separation | ½ of total value | ½ of total value | Not in record. |
| Chase Account | X | | Not in record. |
| Wells Fargo Account | | X | $124.07 (as of 9/27/17) |
| Columbia Credit Union Account | | X | $13,393 |
| Columbia Credit Union Account | | X | $51 |
| **Total:** | | | **$13,568.07** |

CP at 19, 23 39.

Based on the record, the total distribution of separate and community property to the parties was as follows: Brenda was awarded $695,077 of the income-producing properties, as well as various bank accounts, her personal property, her cars, and the separate property listed in the prenuptial agreement. Gary was awarded $291,000 of the income-producing properties, as well as the family residence worth $308,000, various accounts, his personal property, his cars, and the separate property listed in the prenuptial agreement. In dividing the community property as it did, the trial court concluded that "[t]aking into consideration the parties' prenuptial agreement, the nature and extent of all of the community and separate property, the duration of the marriage, and the economic circumstances of each spouse at the time of dissolution, the court[] divides the assets and debts of the parties." CP at 32.

D. LOST RENTAL INCOME AND PROFITS-JUDGMENT TO GARY

After considering both Couch's and Bowen's accountings, the court ordered Brenda to pay Gary "for his community share of net profits and proceeds from the parties' investment properties," to be secured by a promissory note and deed of trust on one of the properties awarded to Brenda. CP at 20. In determining the amount of the judgment, and ordering that Brenda pay Gary $142,287, the court relied on Couch's accounting through February 2017. This figure, based on Couch's accounting, was based on money that Brenda owed Gary because he was underpaid rental property income, and he overpaid the expenditures. Based on Couch's accounting, the court found that Brenda had not been charging fair market rental value, her business was not paying rent for the space it used, and Brenda provided "comp stays" to her clients. Verbatim Report of Proceedings (VRP) at 832.

The court found Brenda liable for, and Gary due, the following sums arising from Brenda's exclusive management of the parties' investment properties:

- $71,244 for the first accounting period for Gary's share of net profits and proceeds
- $12,855 for the second accounting period for Gary's share of net profits and proceeds
- $12,293 for half of the lost fair market rental value for the Columbia River Drive property
- $36,895 for half of the lost fair market value for the Eagle Crest property

CP at 20.

E. OFFSET

In total, the trial court found that Brenda owed Gary $142,287. The court offset that amount by $39,000, roughly one-half of the amount Gary paid his father for work done on the

rental properties. Gary testified that he had paid his father from a premarital separate property account, the Solarity account, but with funds that had been comingled with Brenda's.

Brenda testified that Gary's father was not entitled to be paid for his work. Brenda testified that she was unaware of the payment, but Gary testified that she was aware of it. Couch also testified that Gary provided her with text messages between himself and Brenda which showed that Brenda was aware that Gary was paying his father. Even though the trial court found that the "Solarity" account was Gary's separate property under the prenuptial agreement, the court found that Gary failed to prove that the money paid to his father constituted a community debt, and it ruled that Brenda was entitled to an offset to "reimburse $39,000 for her share" of the $70,000 paid to Gary's father. CP at 20. The court stated:

> Wife is not ordered an offset for – and Husband is – the separate property house, there is no offset for any – I didn't find the evidence sufficient to establish the $80,000 offset for improvements made during the marriage.
>
> So, likewise, regarding the payments made to Mr. Wilson's dad, I do not find sufficient documentation or evidence to establish that. So I am awarding the Solarity account to [Gary] and putting that in his column, but not giving that as – not allowing that it is a division of community property, essentially, that's offsetting the award on some of the other properties.

VRP at 831-32.

F. CHILD SUPPORT ORDER CALCULATION

The trial court entered a parenting plan with a shared 50/50 residential schedule for the parties' two minor children. In its child support order, the court set Brenda's net monthly income at $12,000 and Gary's net monthly income at $6,136.43. The court adopted the "[m]other's agreed figure of $12,000" as her net monthly income. VRP at 829.

13

In her trial aid briefing, Brenda urged the trial court to determine her net monthly income from employment as $12,000 per month. Brenda testified at trial that she was asking the court to set her monthly net income at $12,000 per month, which she arrived at from her 2016 gross income. She also testified that her net income for the year, as of March of 2017, from sales commissions alone was $37,601.44. At the final hearing following trial, the court indicated that it had based the child support calculations on the 2017 tax returns, which Gary's counsel then asked about. The court said, "I think what she indicated to me is that she wanted it set, I believe, at a 12,000 amount." VRP at 829. Brenda did not object.

G. DENIAL OF TRANSFER PAYMENT

The standard child support calculation was $1,912.48 from Brenda to Gary. The trial court then applied an overnight credit of $1,302.50 to Brenda because of the 50/50 residential schedule, which reduced the transfer payment to Gary to $609.98.

The trial court decided to deviate from the already-reduced transfer payment after the residential credit because "[t]he children . . . spend significant time with the parent who owes support, [and] [t]he non-standard amount still gives the other parent's household enough money for the children's basic needs." CP at 44. Based on this deviation, the trial court denied Gary's request for a transfer payment from Brenda. The trial court stated that the facts supporting its decision were contained in the child support worksheets. However, in the record before us, these sections of the worksheets is completely blank.

H. APPEALS

Brenda appeals and assigns error to provisions of the final dissolution order, provisions of the findings of fact and conclusions of law regarding the marital estate, and provisions of the child support order. Gary cross appeals.

ANALYSIS

Brenda argues that the trial court erred by (1) setting her net monthly income at $12,000, and (2) basing entry of the judgment owed by Brenda to Gary on Couch's testimony, reports, and accounting of the community investment rental properties. In his cross appeal, Gary argues that the trial court erred by (3) deviating from the standard child support calculation without sufficient written findings of fact, (4) denying him a transfer payment from Brenda, and (5) dividing up the marital estate as it did rather than equalizing the distribution of it as required under the prenuptial agreement. We affirm in part and reverse in part, and remand for further proceedings consistent with this opinion.

I. STANDARD OF REVIEW

Final dissolution orders and child support orders are reviewed for a manifest abuse of discretion. *See In re Parentage of L.H.*, 198 Wn. App. 190, 194, 391 P.3d 490 (2016); *In re Marriage of Booth*, 114 Wn.2d 772, 776, 791 P.2d 519 (1990). A trial court abuses its discretion if its decision is manifestly unreasonable or based on untenable grounds or untenable reasons. *In re Marriage of Katare*, 175 Wn.2d 23, 35, 283 P.3d 546 (2012).

II. BRENDA'S NET MONTHLY INCOME

Brenda argues that the trial court erred by setting her net monthly income at $12,000 for the child support calculation based on her 2016 tax return, rather than relying on updated 2017 tax

return information.[3]   We hold that substantial evidence supports the trial court's finding that Brenda's net monthly income was $12,000 and thus, the court did not manifestly abuse its discretion.

We review a trial court's findings to determine whether they are supported by substantial evidence in the record.  *In re Marriage of Wilson*, 165 Wn. App. 333, 340, 267 P.3d 485 (2011). This court will "'not substitute [its] judgment for the trial court's, weigh the evidence, or adjudge witness credibility.'"  *In re Marriage of Rockwell*, 141 Wn. App. 235, 242, 170 P.3d 572 (2007) (alteration in original) (quoting *In re Marriage of Greene*, 97 Wn. App. 708, 714, 986 P.2d 144 (1999)).  "In determining whether substantial evidence exists to support a court's finding of fact, the record is reviewed in the light most favorable to the party in whose favor the findings were entered."  *In re Marriage of Gillespie*, 89 Wn. App. 390, 404, 948 P.2d 1338 (1997).

Here, Brenda testified that her gross income in 2016 was "$203,220 or $16,935 per month." VRP at 229.  She also testified that her net income for 2017, as of that March, from sales

---

[3] Preliminarily, Gary argues that Brenda invited any error.  We agree.

Under the invited error doctrine, a party may not set up an alleged error and then complain about the error on appeal.  *In re Marriage of Morris*, 176 Wn. App. 893, 900, 309 P.3d 767 (2013).

Here, the trial court set Brenda's net monthly income at $12,000 because she specifically asked the court to do so.  In her trial aid briefing, Brenda urged the court to determine her net monthly income from employment is $12,000 per month.  She testified at trial that she was asking the court to set her net monthly income at $12,000 per month, which she arrived at from her 2016 gross income.  Further, Brenda never requested that the trial court verify her income under RCW 26.19.071.

We agree with Gary and hold that the invited error doctrine applies, so Brenda may not complain about the error on appeal.  *Morris*, 176 Wn. App. at 900.  However, we exercise our discretion under RAP 1.2(c) to reach the merits.

commissions alone was $37,601.44. This number did not include her monthly base salary of between $1,900 and $2,500 or income she received from her rental properties. Because Brenda testified that she had made $37,601.44 in the first three months of 2017, her net monthly income was roughly $12,533.66. Therefore, her 2017 income from her 2017 tax return was still consistent with her 2016 net income, which the court accepted to determine her net monthly income. Because substantial evidence supports the trial court's finding that Brenda's net monthly income at the time of trial was $12,000, we hold that there was no manifest abuse of discretion, and the court's calculation is correct.

### III. DEVIATION DOWNWARD FROM THE STANDARD CHILD SUPPORT CALCULATION

Gary argues that the trial court erred by deviating downward from the standard child support calculation without sufficient written findings and by failing to order a transfer payment to him. He argues that given the parties' respective incomes, the standard child support calculation required a transfer payment of $609.98 from Brenda to Gary. Gary claims that based on the parties' income disparity, there were no grounds to deviate downward from the standard child support calculation and to eliminate the transfer payment entirely from $609.98 to zero. Because we are unable to determine the basis for the court's deviation from the standard child support calculation, we remand and order the trial court to make sufficient written findings of fact to support any deviation from the standard child support calculation and to reconsider its decision to deny any transfer payment from Brenda to Gary, and to amend the child support order accordingly.

The legislature adopted the uniform child support schedule as a means to equitably apportion the child support obligation between parents, insure child support is adequate to meet a child's basic needs, and provide additional child support commensurate with the parents' income,

resources, and standard of living. RCW 26.19.001. A child support order must be supported by written findings of fact and must be accompanied by a completed child support worksheet signed under penalty of perjury by both parties and signed as correct upon review by the presiding judicial officer. RCW 26.19.035(2), (3).

Under RCW 26.19.075, the trial court has discretion to deviate from the standard child support calculation based on a variety of factors, including: the child's residential schedule and the effect the child support obligation has on the parents' income and expenses. Under the plain language of the statute, if the child spends a significant amount of time with the parent who is obligated to make a support payment, then the court may deviate downward from the standard child support calculation. RCW 26.19.075(1)(d). However, the court may not deviate if doing so will result in insufficient funds to meet the basic needs of the child in the household receiving the child support. RCW 26.19.075(1)(d). Further, deviation "remains the exception to the rule and should be used only where it would be inequitable not to do so." *In re Marriage of Burch*, 81 Wn. App. 756, 760, 916 P.2d 443 (1996).

"The statute also unequivocally requires written findings of fact to support any deviation and a consideration of the total circumstances of both households." *In re Marriage of Choate*, 143 Wn. App. 235, 242, 177 P.3d 175 (2008) (citing RCW 26.19.075; *In re Marriage of McCausland*, 159 Wn.2d 607, 620, 152 P.3d 1013 (2007) (emphasis omitted) ("Although cursory findings of fact and the trial record might appear to justify awarding a child support amount that exceeds the economic table, only the entry of written findings of fact demonstrate that the trial court *properly exercised its discretion* in making the award."). Where written findings of fact are insufficient or

unclear, we may construe the court's order by reviewing its oral ruling. *See Shelden v. Dep't of Licensing*, 68 Wn. App. 681, 685, 845 P.2d 341 (1993).

Here, as discussed above, the court awarded Brenda the majority of the income-producing investment rental properties, and thus, her income will be substantially more than her claimed net monthly income of $12,000—compared to Gary who will no longer be receiving income from four of the five community investment properties and whose net monthly income is $6,136.43.

The trial court calculated the standard calculation from the parties' worksheets and the parties' net monthly incomes, Brenda at $12,000 and Gary at $6,136.43:

| Parent Name: | Standard Calculation Worksheet line 17 |
| --- | --- |
| *Brenda Wilson* | $1,912.48 (Ex. A) <br> $2,094.53 (Ex. B) |
| *Gary Wilson* | $692.52 (Ex. A) <br> $785.47 (Ex. B) |

CP at 44, 54, 60.

The trial court calculated the standard calculation of $1,912.48 from Brenda to Gary. The court applied a residential credit of $1,302.50 to Brenda based on the 50/50 residential schedule, resulting in a transfer payment calculation of $609.98 to Gary. The court decided to deviate downward from this calculation, which already accounted for the residential credit, of $609.98 to zero because "[t]he children . . . spend significant time with the parent who owes support, [and] [t]he non-standard amount still gives the other parent's household enough money for the children's basic needs." CP at 44. Based on this deviation, the trial court did not order any transfer payment by Brenda to Gary. To support this deviation, the court cited the worksheets, Part VIII, lines 20

through 26. However, these sections of the worksheets are completely blank. *See* CP at 54-55, 60-61. Therefore, it is unclear based on the record before us what facts the trial court relied upon in deciding to deviate from the transfer payment calculation of $609.98 to zero.

Here, there are no written findings of fact explaining that the trial court considered "evidence concerning the increased expenses to [Brenda] making support transfer payments resulting from the significant amount of time with [her]." RCW 26.19.075(1)(d). There are also no findings that Gary has decreased expenses because the children reside with him and Brenda equally. In fact, there was evidence that Gary shoulders certain expenses Brenda does not, such as the children's medical and dental insurance, which is $211.14 per month. Although the parties both provided testimony regarding their respective costs for their children, the court did not incorporate this into its findings. Further, the court granted a residential credit when it lowered the transfer payment to $609.98, and then it reduced the transfer payment again to zero with no explanation.

As discussed above, we can rely upon the court's oral ruling to determine the court's intent here. *Shelden*, 68 Wn. App. at 685. However, the court's oral ruling does not clarify the basis for ordering a deviation or for ordering no transfer payment from Brenda to Gary. Therefore, based on this record, we cannot be sure that the trial court "properly exercised its discretion" in ordering a deviation and in ordering no transfer payment. *McCausland*, 159 Wn.2d at 620 (emphasis omitted).

We hold that based on this record, the trial court failed to provide written findings of fact to support its decision to deviate from the standard child support calculation and failed to justify its denial of any transfer payment from Brenda to Gary. Because of the lack of an adequate record,

we reverse and order the trial court to make sufficient written findings of fact to support any deviation from the standard child support calculation and to reconsider its decision to deny any transfer payment from Brenda to Gary, and to amend the child support order accordingly.

## IV. COUCH ACCOUNTING

Brenda argues that the trial court erred by adopting Couch's accounting of the net lost income to Gary because Couch's accounting exceeded the scope of her original expert appointment. She also argues that substantial evidence does not support the court's findings, and the findings do not support the court's conclusions. We hold that (1) the trial court did not err by adopting Couch's accounting, (2) Couch did not exceed the scope of her appointment, and (3) there was substantial evidence to support the trial court's findings, and the findings support the count's conclusions regarding the amount of lost fair market rental income and profits Brenda owed Gary. Therefore, the trial court did not err by entering a judgment in the amount of $142,287 for Gary.

"Admissibility of evidence is within the broad discretion of the trial court and will not be reversed on appeal absent a showing of manifest abuse of discretion." *In re Parentage of J.H.*, 112 Wn. App. 486, 495, 49 P.3d 154 (2002). "Discretion is abused if it is based on untenable grounds or for untenable reasons." *J.H.*, 112 Wn. App. at 495. We "may sustain a trial court on any correct ground, even though that ground was not considered by the trial court." *J.H.*, 112 Wn. App. at 495. The factfinder has broad discretion in weighing expert opinions. *In re Marriage of Sedlock*, 69 Wn. App. 484, 491, 849 P.2d 1243 (1993).

ER 702 establishes that expert testimony may be used at trial "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine

a fact in issue." ER 703 allows an expert to base her opinion on facts made known to the expert prior to trial. ER 704 establishes that an expert may provide her opinion on an ultimate issue. Finally, ER 705 establishes that the expert may testify to her opinion or inference without prior disclosure of the underlying facts or data.

The trial court's order appointing Couch to perform a forensic accounting stated, in relevant part,

> For each separate real estate investment identified above, the professional shall determine the net amount actually received by each party and the amount actually paid by each party for any "expenses" for each separate real estate investment between May 1, 2013 and February 29, 2016 . . . .

CP at 106. The court extended Couch's appointment through February 28, 2017, to create a second accounting period, but denied Couch's request to expand the scope of her appointment beyond that date.

After considering both experts' accountings, the court ordered Brenda to pay Gary "for his community share of net profits and proceeds from the parties' investment properties," to be secured by a promissory note and deed of trust on one of the properties awarded to Brenda. CP at 20. In determining the amount of the judgment, and ordering that Brenda pay Gary $142,287, the court adopted Couch's accounting through February 2017. This figure was based on Couch's calculations which showed that Brenda owed Gary funds generated from the income properties because he was underpaid for the rental property income, and he overpaid the expenditures. Based on Couch's accounting, the court found that Brenda had not been charging fair market rental value, her business was not paying rent for the space it used, and that Brenda provided "comp stays" to her clients. VRP at 832.

On this record, Brenda fails to show how Couch exceeded the scope of her initial appointment when Couch provided the court with the accounting it ordered on the investment properties. Brenda also fails to show that the court erred by adopting Couch's accounting. And substantial evidence supports the court's findings and the findings support the court's conclusions related to the net lost profit and proceeds. We hold that (1) the trial court did not err by adopting Couch's accounting, (2) Couch did not exceed the scope of her appointment, and (3) there was substantial evidence to support the trial court's findings, and the findings support the count's conclusions regarding the amount of lost fair market rental income and profits Brenda owed Gary. Therefore, the trial court did not err by entering a judgment in the amount of $142,287 for Gary.

## V. DIVISION OF THE COMMUNITY ESTATE

Gary argues that the trial court erred by awarding a disproportionate share of the community estate to Brenda instead of dividing it as "equally as possible," as required by the prenuptial agreement. We hold that the trial court erred by not fully abiding by the prenuptial agreement and by not dividing the community estate as equally as possible. Thus, we reverse the portion of the final decree of dissolution related to the community property distribution.

### A. STANDARD OF REVIEW

A prenuptial agreement is binding if it is procedurally and substantively fair. *In re Marriage of Bernard*, 165 Wn.2d 895, 902, 204 P.3d 907 (2009). "Public policy favors prenuptial agreements." *In re Marriage of Marzetta*, 129 Wn. App. 607, 617, 120 P.3d 75 (2005), *abrogated on other grounds by*, *McCausland*, 159 Wn.2d 607. "Prenuptial agreements are contracts subject to the principles of contract law." *Marzetta*, 129 Wn. App. at 617.

In dissolution proceedings, the trial court has broad discretion to make a just and equitable distribution of all property based on the factors enumerated in RCW 26.09.080. *Rockwell*, 141 Wn. App. at 242-43. A division of property need not be precisely equal; rather, it must be fair to both parties depending on their circumstances at the time of the dissolution. RCW 26.09.080.

RCW 26.09.080 provides a list of factors the court must consider, including, but not limited to:

> (1) [t]he nature and extent of the community property; (2) [t]he nature and extent of the separate property; (3) [t]he duration of the marriage or domestic partnership; and (4) [t]he economic circumstances of each spouse or domestic partner at the time the division of property is to become effective, including the desirability of awarding the family home or the right to live therein for reasonable periods to a spouse or domestic partner with whom the children reside the majority of the time.

The court must make a "just and equitable" distribution of the property. RCW 26.09.080. "All property, community and separate, is before the court for distribution." *In re Marriage of Doneen*, 197 Wn. App. 941, 948, 391 P.3d 594 (2017). We

> "will not single out a particular factor, such as the character of the property, and require as a matter of law that it be given greater weight than other relevant factors. The statute directs the trial court to weigh all of the factors, within the context of the particular circumstances of the parties, to come to a fair, just and equitable division of property. The character of the property is a relevant factor which must be considered, but it is not controlling."

*Doneen*, 197 Wn. App. at 948-49 (quoting *In re Marriage of Konzen*, 103 Wn.2d 470, 478, 693 P.2d 97 (1985)).

The trial court has broad discretion in dividing property in a decree of dissolution and will be reversed only upon a showing of a manifest abuse of discretion. *In re Marriage of Buchanan*, 150 Wn. App. 730, 735, 207 P.3d 478 (2009). A trial court abuses its discretion if its decision is manifestly unreasonable, meaning that its decision is outside the range of acceptable choices, or is

based upon untenable grounds. *Buchanan*, 150 Wn. App. at 735. We review the trial court's factual findings for substantial evidence, which is "'evidence of sufficient quantity to persuade a fair-minded, rational person of the truth of the declared premise.'" *Rockwell*, 141 Wn. App. at 242, (quoting *In re Marriage of Griswold*, 112 Wn. App. 333, 339, 48 P.3d 1018 (2002)). Where written findings of fact are insufficient or unclear, we may construe the court's order by reviewing its oral ruling. *Shelden*, 68 Wn. App. at 685.

B. COMMUNITY PROPERTY DISTRIBUTION

At trial, the parties' community estate consisted largely of five rental properties and their family home. As stated above, the trial court awarded the community investment properties between the parties. Gary was awarded the family home and the Robin Court property (totaling $599,000) and Brenda was awarded the remaining four properties (totaling $695,077).

The court also awarded one-half of Gary's retirement to each party, and the four community bank accounts with the Chase account going to Gary and the Wells Fargo and Columbia Credit Union accounts going to Benda. Here, the trial court found that the prenuptial agreement was valid and enforceable. However, the court, in dividing the marital estate, explained,

> [T]he job of the [c]ourt is to make a fair and equitable division of assets, and I do not do that with precision between the parties. There's a number of factors. Like I say, probably this case has what I would call more moving parts than most, in that Mrs. Wilson has a very good career but she also spent a good portion of her career as primary. And we have the prenuptial agreement so that I – it says, you know, don't look at separate property, but I don't think that binds the court not to look at the overall division.

VRP at 833-34.

Gary argues that the trial court ignored the provision in the prenuptial agreement which states, "The parties' community assets and debts shall be divided as equally as possible." Ex. 1 at

15. Another related provision in the agreement states, "In dividing assets and liabilities of their marital community, the separate property of each party shall not be taken into account directly or indirectly." Ex. 1 at 14. Gary claims that the court had two options to equalize the judgment: (1) award him an additional $48,038.50 to the $599,000 in community real property that he was awarded (compared to Brenda's award of $695,077), or (2) award him the Fairwinds Loop property valued at $123,000 and award Brenda an offset to the $142,247 judgment she owes him.

We agree with Gary that the prenuptial agreement, which is valid and enforceable, requires the court to divide the community property "as equally as possible." The trial court failed to do so here. Although the trial court has broad discretion to divide the property equitably, it failed to abide by a valid and enforceable prenuptial agreement. Thus, we reverse this portion of the decree of dissolution related to the distribution of community estate.

## VI. OFFSET

Gary argues that the trial court erred by offsetting the judgment by $39,000. Brenda argues that this was not an error because her name was listed on the Solarity account, and she did not approve of Gary's payment of funds from that account to his father for the work he performed on the rental properties. We agree with Gary that the court erred by granting Brenda an offset of $39,000.

"'In performing its obligation to make a just and equitable distribution of properties and liabilities in a marriage dissolution action, the trial court must characterize the property before it as either community or separate.'" *In re Marriage of Groves*, 10 Wn. App. 2d 249, 254, 447 P.3d 643 (2019) (quoting *In re Marriage of Kile*, 186 Wn. App. 864, 875, 347 P.3d 894 (2015) *review*

*denied*, 458 P. 3d 781 (2020)).  We review de novo a trial court's characterization of property as separate or community." *Groves*, 10 Wn. App. 2d at 254.

Here, because the trial court found the prenuptial agreement to be valid and enforceable, it was bound by it.  *Bernard*, 165 Wn.2d at 902.  Pursuant to the prenuptial agreement, the court properly characterized the Solarity account as Gary's separate property.  Brenda does not challenge this finding.

The prenuptial agreement also states in relevant part that:

[N]either party shall claim a right of reimbursement for any labor, materials, money, or the like contributed to or on behalf of the separate property of the other party and any such contribution shall be considered either a de minimis contribution, a gift to the other party, or that the community has received a compensating benefit from the use of the property to or for which the contribution was made.

Ex. 1 at 5.

Under the provisions of the prenuptial agreement, even though Brenda's name was on the Solarity account and community funds may have been deposited into the account "from time to time," Brenda does not have a right of reimbursement under the prenuptial agreement.  Ex. 1 at 3-5.  Thus, we hold that that the trial court erred by offsetting the judgment to Gary of $142,287 by $39,000.  We remand this portion of the final decree of dissolution and order the court to strike the $39,000 offset and amend the judgment accordingly.

VII.  APPELLATE ATTORNEY FEES AND COSTS

Brenda argues that based on RAP 18.1(a), she is entitled to an award of appellate attorney fees and costs.  We deny her request.

> If applicable law grants to a party the right to recover reasonable attorney fees or expenses on review . . . the party must request the fees or expenses as provided in this rule.

RAP 18.1(a). However, the prenuptial agreement does not allow for a party to request attorney fees. Because Brenda is not entitled to an award of attorney fees and costs, we deny her request.

CONCLUSION

We affirm (1) the trial court's finding that Brenda's net monthly income is $12,000 for child support, and (2) the court's ruling adopting Couch's accounting for purposes of determining the amount of net lost profit and proceeds owed by Brenda to Gary for their investment rental properties. We reverse (3) the provisions of the child support order related to the deviation from the standard child support calculation and the court's decision not to order a transfer payment from Brenda to Gary. We also reverse (4) the provisions of the final dissolution order related to the distribution of the community estate, and (5) the portion of the money judgment entered in favor of Gary related to the offset of $39,000.

We remand for further proceedings consistent with this opinion. On remand, we order the court to (1) make sufficient written findings of fact to support any deviation from the standard child support calculation and to reconsider its decision to deny any transfer payment from Brenda to Gary, and to amend the child support order accordingly, (2) reconsider the distribution of the community property and equalize the division of it as equally as possible, and (3) strike the $39,000 offset and amend the money judgment accordingly.

No. 52160-14-II

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

SUTTON, A.C.J.

We concur:

MAXA, J.

GLASGOW, J.