IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parentage of T.O. and TS.O.<br><br>TERRANCE O'DONNELL,<br><br>        Appellant,<br><br>        v.<br><br>CECILIA CARTER,<br><br>        Respondent. | No. 86800-4-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. —Terrence O'Donnell appeals the parenting plan and child support order entered at the conclusion of an informal family law trial. O'Donnell presents a number of challenges to the trial court's findings of fact, conclusions of law, and final orders, none of which are availing. Because O'Donnell fails to demonstrate error, we affirm.

## FACTS

Terrance O'Donnell and Cecilia Carter met in 2019 and never married. The parties have two children together who were two and four at the time the parenting plan was entered. The record on appeal establishes that the parties had a contentious relationship, with several separations and reunifications, as evidenced by the voluminous text correspondence included as exhibits and testimony. O'Donnell filed a petition seeking a parenting plan in March 2023. The initial

temporary order formalized a preexisting arrangement where the children resided with Carter during the week, and then spent Friday through Sunday with O'Donnell. This arrangement reflected the fact that Carter worked weekends. At the time of trial, O'Donnell was not employed due to mental health diagnoses and received supplemental security income (SSI).

The parties appeared for an informal family law trial in May 2024. Carter was represented by counsel while O'Donnell appear pro se. The stated purpose of the trial was to address a "parenting plan, including child-support determination and the relocation." In his opening statement, O'Donnell requested designation as the primary custodial parent, for Carter to pay him child support, and denial of Carter's proposed order authorizing relocation. He also proposed a final parenting plan with a substantially different residential schedule than the one in place at the time of trial. Carter asked for the court to maintain the current residential schedule because O'Donnell's proposed schedule was not offered in good faith and, instead, was based on "ulterior motives," alleging that O'Donnell was "financially motivated" and custody of the children could get him more advantageous housing. Carter also noted that, at that time, O'Donnell had not provided any evidence of his income and asked the court impute it for purposes of child support calculation. In response, O'Donnell told the court he would upload documentation related to a recent SSI hearing to assist the court in assessing his income and ability to work.

O'Donnell testified at length about his contentious relationship with Carter, their conflicts over visitation and healthcare, his inability to work, and the relationship he has with his sons. Carter testified about their "toxic, off and on"

relationship, admitting that O'Donnell was a good father, but asserting that he is a bad co-parent. Carter also provided her explanations for O'Donnell's allegations that she is an unfit parent and about the proposed relocation.

The judge took the testimony under advisement and entered orders and findings approximately one week later. The parenting plan included a finding that both O'Donnell and Carter "use conflict in a way that may cause damage to the psychological development of the child[ren]." The plan also required the parents to communicate through specific software, to not prevent the other parent from contacting the children, and to not speak poorly about the other parent in front of the children. It maintained the established residential schedule. The child support order required O'Donnell to pay $100 a month to Carter. The judge also approved Carter's proposed relocation.

O'Donnell timely appealed and Carter declined to file a response brief.

ANALYSIS

I.    Child Support Order

O'Donnell asserts that the trial court abused its discretion by imputing his income, despite the fact he only receives SSI which is statutorily excluded from the calculation of income for purposes of child support. He further argues that the court imputed his income in spite of his disabilities that render him unemployable. O'Donnell misunderstands the child support order and worksheets; the trial court did not impute any income to him, but rather applied the basic presumptive amount owed as required by RCW 26.19.065(2) based on zero income attributed to him.

We review child support orders for manifest abuse of discretion and will not disturb the trial court's order unless it relies on an incorrect interpretation of the law. *In re Marriage of Sprute*, 186 Wn. App 342, 357, 344 P.3d 730 (2015). RCW 26.19.071 sets the standard for determining the parents' income for the purposes of a child support order. SSI is statutorily excluded from gross monthly income. RCW 26.19.071(4)(e). If the court determines a parent is "voluntarily unemployed or voluntarily underemployed," it shall impute the income of that parent. RCW 26.19.071(6). However, "[i]ncome shall not be imputed for an unemployable parent." *Id.*

The trial court correctly interpreted and applied the controlling law here. The judge determined that O'Donnell did not have a monthly income and explicitly stated that "O'Donnell is disabled and receives SSI benefits which are not included as income per RCW 26.19.071(4)(e)." Similarly, the trial court did not impute any income; it used O'Donnell's actual creditable income of zero dollars.[1] The court then applied the presumptive minimal support obligation pursuant to RCW 26.19.065(2) because O'Donnell's income fell below the self-support reserve.[2]

> When a parent's monthly net income is below one hundred twenty-five percent of the federal poverty guideline for a one-person family, *a support order of not less than fifty dollars per child per month shall be entered unless the obligor parent establishes that it would be unjust to do so in that particular case.*

---

[1] The report of proceedings from the trial does suggest that the temporary child support order previously entered by a court commissioner had in fact relied on imputed income for O'Donnell, in the absence of any documentary evidence regarding his finances. However, the judge here clearly accepted, and relied on, the documentation he provided at trial regarding his disability status and income.

[2] "Washington State Courts use the self-support reserve to calculate low income limitations when setting support. The self-support reserve is 125 percent of the federal poverty guidelines for a one-person family." 22 ELIZABETH A. TURNER, WASHINGTON PRACTICE: FAMILY AND COMMUNITY PROPERTY LAW HANDBOOK ch. 4, note at 1203 (2024 ed.).

RCW 26.19.065(2)(a) (emphasis added). While O'Donnell emphasizes the statute exempting SSI from income calculation for child support, he fails to engage with RCW 26.19.065(2)(a) at all, much less explain how the court's compliance with the mandatory language of this statute conflicts with the SSI exemption language from RCW 26.19.071(4)(e). Accordingly, he does not establish an abuse of discretion in the calculation or award of child support.

## II.    Parenting Plan

O'Donnell avers that the residential schedule set out in the parenting plan was improper because the court's designation of Carter as the custodian was not in the best interests of the children and the court further erred in finding that his proposed plan was submitted in bad faith. We disagree.

### A.    Designation of Custodian

O'Donnell's contention as to the residential schedule and designation of custodian rests on his allegations of "Carter's blameworthy conduct," blocking his access to the children, disparaging him in front of the children, and failing to attend to the children's medical needs and hygiene. However, O'Donnell simply attempts to reargue the matter based on these assertions rather than demonstrate how the court failed to apply the controlling legal standard.

"[W]e give broad deference to the trial court's findings. An appellate court will not lightly disturb the custody ruling due to the trial courts 'unique opportunity to personally observe the parties.'" *In re Custody of SA-M*, 17 Wn. App. 2d 939, 951, 489 P.3d 259 (2021) (quoting *In re Custody of Stell*, 56 Wn. App. 356, 366,

783 P.2d 615 (1989)). "[T]rial courts are given broad discretion in matters dealing with the welfare of children. A trial court's decision will not be reversed on appeal unless the court exercised its discretion in an untenable or manifestly unreasonable way." *In re Marriage of McDole*, 122 Wn.2d 604, 610, 859 P.2d 1239 (1993) (citations omitted). We uphold findings of fact that are supported by substantial evidence. *Id.*

The trial court here credited Carter's testimony and acted within its discretion. While the court did enter findings of fact that indicate Carter involved the children in the conflict, similar findings were made about O'Donnell. The court expressly found that "[b]oth parties have demonstrated abusive use of conflict that may have a detrimental effect on the children and the other parent's relationship to the children."[3] The court acknowledged that Carter had "blocked [O'Donnell's] phone and video call access to the children" and she had "used manipulative tactics to create conflict with" him.

However, the court did not make any finding of neglect, thereby crediting Carter's explanation of an incident that O'Donnell alleged demonstrated her failure to attend to the children's hygiene. There was also no finding that Carter was withholding the children without a good reason; the court credited Carter's explanation that the times when the children stayed with her family instead of going to O'Donnell were necessitated by him declining to take them. Carter also

---

[3] "Abusive use of conflict includes, but is not limited to, abusive litigation as defined in RCW 26.51.020. If the court finds a parent has engaged in abusive litigation, the court may impose any restrictions or remedies set forth in chapter 26.51 RCW in addition to including a finding in the parenting plan. Litigation that is aggressive or improper but that does not meet the definition of abusive litigation shall not constitute a basis for a finding under this section." RCW 26.09.191(3)(e).

explained that both parents had taken the children to the doctor and she would continue to allow O'Donnell to schedule appointments. But, Carter also stated that she no longer "jump[s]" to take the children to a doctor's appointment just because O'Donnell has raised concerns, citing worries about having to pay out of pocket for unnecessary visits for common ailments. Finally, the trial court found that Carter and O'Donnell both have "a strong, stable, and loving relationship with the children" and described these relationships as "equally strong." The judge credited Carter's explanations of the alleged deficiencies, found the parents equally responsible for conflict, but also that both parents had good relationships with the children.

While O'Donnell anchors this assignment of error in a claim that the court failed to properly consider the best interests of the children, his disagreement with the court's conclusion on this point is insufficient to establish reversible error. Because the custody determination was supported by substantial evidence, we will not disturb it.

### B. Rejection of Proposed Parenting Plan

O'Donnell next challenges the trial court's finding that his parenting plan was submitted in bad faith. The court found that O'Donnell's proposed plan would allow Carter residential time with the children only on days that she works. If it was implemented, she would be able to see the children only by changing her employment. The court called his proposal "patently unreasonable and done with intent to harass and the intent to disrupt the mother's relationship with the children."

He argues that it is not supported by substantial evidence because he had good faith reasons for filing the plan; the current plan limits his parenting time, the

proposed plan reflects his desire to spend more time with the children and provide them stability, and his submission better conforms with Carter's alleged new work schedule. Without citation to any evidence, O'Donnell asserts that Carter "accepted a new shift, which she is working from Monday to Friday from 8 am to 4:30 pm." There is nothing in the record on appeal that corroborates this contention. We may not consider evidence that was not before the trial court. *Morgan v. Briney*, 200 Wn. App 380, 394, 403 P.3d 86 (2017).

Again, we uphold findings of fact supported by substantial evidence. *McDole*, 122 Wn.2d at 610. "'We will not substitute our judgment for the trial court's, weigh the evidence, or adjudge witness credibility.'" *In re Marriage of DeVogel*, 22 Wn. App. 2d 39, 48, 509 P.3d 832 (2022) (quoting *In re Marriage of Greene,* 97 Wn. App 708, 714, 986 P.2d 144 (1999)).

At trial, Carter testified that she works 12-hour shifts Friday through Sunday and she has done so since she was first pregnant, except for a period where she and O'Donnell lived together. There is nothing before us to indicate that Carter has accepted a new shift apart from O'Donnell's unsupported assertion. Accordingly, he fails to establish error as to this finding.

III.    Order on Relocation

O'Donnell next relies on RCW 26.09.520 in support of his claim that Carter failed to conform to procedural and notice requirements for relocation. However, this statute does not provide any notice requirement, but rather provides the factors the court will consider in making its relocation decision. The judge explained this when she cited the statute and set out the factors at the start of the trial. The

relevant notice requirements and the procedure for objecting to relocation are set out elsewhere in the chapter. *See* RCW 26.09.430-.480. Because O'Donnell's brief fails to engage with the relevant law, and the record before us does not include facts related to the timing of Carter's notice of relocation, we decline to consider this assignment of error. *See* RAP 2.5(a), 10.3(a)(6); *In re Marriage of Bernard*, 137 Wn. App. 827, 833, 838, 155 P.3d 171 (2007), *aff'd*, 165 Wn.2d 895, 204 P.3d 907 (2009).

IV.    Consideration of Testimony

Finally, O'Donnell avers that the trial judge erred in "dismissing" his testimony regarding the circumstances of conception of the children and he was not afforded "reasonable accommodations as a pro se litigant," which violated his due process rights. O'Donnell quotes from *Mathews v. Eldridge*, which establishes that "[t]he fundamental requirement of due process is the opportunity to be 'heard at a meaningful time and in a meaningful manner.'" 424 U.S. 319, 333, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976) (quoting *Armstrong v. Manzo,* 380 U.S. 545, 552, 85 S. Ct. 1187, 14 L. Ed. 2d 62 (1965)). However here, O'Donnell sought, and was granted, an opportunity to present testimony regarding the matter in question. He also submitted a declaration with the same allegations. Carter rebutted O'Donnell's testimony with her own version of events. The trial judge noted that O'Donnell did not raise this issue prior to submitting his declaration or "file a notice under RCW 26.26A.465." O'Donnell did not assign it any legal consequence in the trial court or in his briefing on appeal. More critically, O'Donnell does not identify what process he was denied.

O'Donnell's argument that he should have been offered reasonable accommodations as a pro se litigant is directly contradicted by long-standing case law.[4]  *See, e.g., In re Marriage of Olson*, 69 Wn. App 621, 626, 850 P.2d 527 (1993); *In re Vulnerable Adult Pet. of Winter*, 12 Wn. App. 2d 815, 844, 460 P.3d 667 (2020); *In re Est. of Little,* 27 Wn. App. 2d 262, 274, 444 P.3d 23 (2019).  He further takes issue with the judge's finding that his testimony in this regard was not credible, "was made for purposes of manipulating and misleading the [c]ourt," and was "an attempt to disparage Ms. Carter."  But, as explained *supra* in Part II.B, we do not review credibility determinations.  Regardless, adverse findings are not a denial of due process.  In light of the expansive authority establishing that we do not disturb the trial court's credibility determinations and that pro se litigants are held to the same standard as attorneys, and in the absence of any substantive analysis of due process, O'Donnell has not established error on this matter.

We affirm.

WE CONCUR:

---

[4] He also cites from the American Bar Association Model Code of Judicial Conduct Rule 2.2 comment 4, which suggests that judges may make reasonable accommodations for pro se litigants so that they may be heard fairly.  However, he does not explain why this model rule might be binding on a Washington judge or address the fact that the rule *permits* judges to make accommodations, but does not require them to do so.